**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**PENINSULA AIRWAYS, INC. AND PENINSULA AVIATION SERVICES, INC.**

**Dated as of October 5, 2018**

# TABLE OF CONTENTS

**Page**

ARTICLE 1 DEFINITIONS ................................................................................................ 1

Section 1.1    Certain Terms Defined ............................................................... 1

Section 1.2    Interpretation ............................................................................. 1

ARTICLE 2 PURCHASE AND SALE OF THE ACQUIRED ASSETS ..................... 2

Section 2.1    Purchase and Sale of Assets ..................................................... 2

Section 2.2    Excluded Assets......................................................................... 5

Section 2.3    Assumption of Liabilities .......................................................... 6

Section 2.4    Excluded Liabilities................................................................... 7

Section 2.5    Assignment and Assumption of Contracts ................................ 9

Section 2.6    Right to Change Designations ................................................ 11

ARTICLE 3 CONSIDERATION ..................................................................................... 11

Section 3.1    Good Faith Deposit.................................................................. 11

Section 3.2    Purchase Price......................................................................... 11

Section 3.3    Allocation of Purchase Price ................................................... 12

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF SELLER ................ 12

Section 4.1    Organization ............................................................................ 12

Section 4.2    Authorization of Agreement .................................................... 12

Section 4.3    Conflicts; Consents of Third Parties........................................ 13

Section 4.4    Title to the Acquired Assets .................................................... 14

Section 4.5    Contracts ................................................................................. 14

Section 4.6    Property ................................................................................... 14

Section 4.7    Intellectual Property ............................................................... 14

Section 4.8    Permits .................................................................................... 14

Section 4.9    Employee Benefit Plans; Employees........................................ 15

Section 4.10    Labor Relations....................................................................... 15

Section 4.11    Environmental Matters ............................................................ 15

Section 4.12    Insurance ................................................................................. 15

Section 4.13    No Brokers or Finders ............................................................. 15

Section 4.14    Litigation; Proceeding ............................................................ 16

Section 4.15    Compliance with Laws ............................................................ 16

Section 4.16    Taxes........................................................................................ 16

i

Section 4.17    Financial Statements ................................................................ 16

Section 4.18    Citizenship ............................................................................... 16

Section 4.19    Station Leases and Equipment .................................................. 17

ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF PURCHASER ......................... 18

Section 5.1    Organization .............................................................................. 18

Section 5.2    Authorization and Validity ........................................................ 18

Section 5.3    No Conflict or Violation ............................................................ 18

Section 5.4    Consents and Approval .............................................................. 18

Section 5.5    Financing ................................................................................... 19

Section 5.6    Litigation ................................................................................... 19

Section 5.7    No Other Representations and Warranties .................................. 19

ARTICLE 6 COVENANTS AND OTHER AGREEMENTS ................................................. 19

Section 6.1    Pre-Closing Covenants of Seller ................................................ 19

Section 6.2    Pre-Closing Covenants of Purchaser .......................................... 22

Section 6.3    Other Covenants of Seller and Purchaser ................................... 23

Section 6.4    Employment Covenants and Other Undertakings ....................... 23

Section 6.5    Casualty .................................................................................... 24

Section 6.6    Confidentiality .......................................................................... 25

Section 6.7    Collection on Acquired Assets ................................................... 25

Section 6.8    Waiver of Bulk Sales Law ......................................................... 25

ARTICLE 7 TAXES ...................................................................................................... 25

Section 7.1    Taxes Related to Purchase of Acquired Assets ........................... 25

ARTICLE 8 ................................................................................................................. 26

ARTICLE 9 CONDITIONS PRECEDENT TO PERFORMANCE BY THE PARTIES ............ 26

Section 9.1    Conditions Precedent to Performance by Seller .......................... 26

Section 9.2    Conditions Precedent to the Performance by Purchaser .............. 27

ARTICLE 10 CLOSING AND DELIVERIES ................................................................... 29

Section 10.1    Closing .................................................................................... 29

Section 10.2    Seller's Deliveries ................................................................... 30

Section 10.3    Purchaser's Deliveries ............................................................ 30

ARTICLE 11 TERMINATION ........................................................................................ 30

Section 11.1    Termination ............................................................................. 30

Section 11.2    Effect of Termination ............................................................... 32

ARTICLE 12 MISCELLANEOUS .................................................................................. 33

Section 12.1    Survival ...................................................................................................... 33

Section 12.2    Further Assurances .................................................................................... 33

Section 12.3    Successors and Assigns ............................................................................ 33

Section 12.4    Governing Law; Jurisdiction .................................................................. 34

Section 12.5    Expenses .................................................................................................... 34

Section 12.6    Severability ............................................................................................... 34

Section 12.7    Notices ...................................................................................................... 34

Section 12.8    Amendments; Waivers ............................................................................ 36

Section 12.9    Entire Agreement ..................................................................................... 36

Section 12.10    Seller Disclosures ................................................................................... 36

Section 12.11    Headings .................................................................................................. 37

Section 12.12    Counterparts ........................................................................................... 37

Section 12.13    Name Change .......................................................................................... 37

Section 12.14    Payments and Revenues ........................................................................ 37

Section 12.15    Waiver of Jury Trial ............................................................................... 37

Section 12.16    No Third Party Beneficiaries ................................................................ 38

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "**Agreement**"), is made and entered into as of October 5, 2018 (the "**Effective Date**"), by and between Peninsula Airways, Inc., an Alaska corporation ("**Seller**"), and Peninsula Aviation Services, Inc., a Delaware corporation (together with its permitted successors, designees and assigns, the "**Purchaser**").

## RECITALS:

The Seller operates an airline passenger business and cargo (mail and freight) business based in Alaska well as a ground handling services business based in both Alaska and in Boston, Massachusetts (collectively, the "**Business**").

The Seller previously filed a voluntary petition for relief under chapter 11 of the U.S. Bankruptcy Code 11 U.S.C. § 101 et seq. (the "**Bankruptcy Code**") and is a Debtor in Case No. 17-00282 GS (the "**Bankruptcy Case**") currently pending in the U.S. Bankruptcy Court for the District of Alaska (the "**Bankruptcy Court**"). Gerard A. McHale, Jr. (the "**Trustee**") was appointed by the Bankruptcy Court as Chapter 11 Trustee for the Seller;

Trustee on behalf of the Seller desires to sell, transfer and assign to Purchaser, and Purchaser desires to acquire and assume from Seller, pursuant to Sections 363 and 365 of the Bankruptcy Code, the Acquired Assets and the Assumed Liabilities as more specifically provided herein;

Trustee has determined that it is advisable and in the best interests of the Seller to consummate the transactions provided for herein pursuant to the Bidding Procedures Order and the Bankruptcy Sale Order and has approved this Agreement; and

The transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to the Bankruptcy Sale Order to be entered in the Bankruptcy Case.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and Seller and Purchaser, intending to be legally bound hereby, agree as follows:

## ARTICLE 1
## DEFINITIONS

Section 1.1    Certain Terms Defined.  Capitalized terms used in this Agreement and not otherwise defined herein shall have the meanings ascribed to such terms on **Schedule 1** attached hereto and as set forth elsewhere herein.

Section 1.2    Interpretation.  When a reference is made in this Agreement to a section or article, such reference shall be to a section or article of this Agreement unless otherwise clearly indicated to the contrary.

(a)     Whenever the words "**include**," "**includes**" or "**including**" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

(b)     The words "**hereof**," "**herein**" and "**herewith**" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement, and article, section, paragraph, exhibit and schedule references are to the articles, sections, paragraphs, exhibits and schedules of this Agreement unless otherwise specified.

(c)     The meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term.  Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(d)     A reference to any party to this Agreement or any other agreement or document shall include such party's permitted successors and assigns.

(e)     Any reference to any specific contract, guaranty, lease, agreement or item shall not operate to exclude such contract, guaranty, lease, agreement or item from any broader defined term herein contained which would otherwise encompass such contract, guaranty, lease, agreement or item generally;

(f)     A reference to any legislation or to any provision of any legislation shall include any amendment to, and any modification or reenactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

(g)     Any reference in this Agreement to $ shall mean U.S. dollars.

(h)     The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party hereto by virtue of the authorship of any provision of this Agreement.

(i)     A reference to a Schedule that is not appended hereto shall be deemed to be appended and have, as content, the word "None."

## ARTICLE 2
## PURCHASE AND SALE OF THE ACQUIRED ASSETS

Section 2.1   <u>Purchase and Sale of Assets</u>.  Subject to the terms and conditions set forth in this Agreement, at the Closing, Purchaser shall purchase, acquire and accept from Seller, and Seller shall sell, transfer, assign, convey and deliver to Purchaser, all of Seller's direct or indirect, right, title and interest in, to and under all of Seller's tangible and intangible assets, properties and rights as of the Closing Date of whatever kind or nature and wherever situated or located, other than the Excluded Assets, free and clear of all pledges, security interests, Liens, Claims, Interests or Encumbrances (other than Permitted Exceptions and Permitted Liens). All of such assets, properties and rights (other than the Excluded Assets) are collectively referred to in this Agreement

2

as the "**Acquired Assets**." Without limitation of the foregoing, the Acquired Assets shall include all Seller's right, title and interest in, to and under the following assets as of the Closing Date, except to the extent that any of the following are also enumerated in **Section 2.2** as being Excluded Assets:

(a)     all Accounts Receivable;

(b)     all Inventories;

(c)     to the extent that they are Assigned Contracts, airport Facility Leases and any other leases, agreements and licenses or arrangements at Stations in Alaska and Massachusetts (collectively, the "**Station Leases**"), together with all Station Property, in each case relating to such assumed Station Leases;

(d)     subject to the approval of the United States Department of Transportation ("**DOT**") and the FAA, Seller's Certificate of Public Convenience and Necessity issued by the DOT under 49 U.S.C. Chapter 411 and Seller's Air Carrier Certificate and Operations Specifications issued by the FAA under 14 CFR Part 121 and 14 CFR Part 135;

(e)     [Reserved];

(f)     all Seller's rights to subsidies or other benefits under the Essential Air Service program;

(g)     all deposits (including, without limitation, security deposits (whether maintained in escrow or otherwise) for Aircraft Leases (except to the extent that such Aircraft Lease is an Excluded Asset under **Section 2.2** below), assumed property leases, utilities and Assumed Assets, the FNBA Deposit, rent, electricity, telephone or otherwise), advances, prepayments, reserves, rights in respect of promotional allowances, vendor rebates and other refunds, claims, causes of action, rights of recovery, rights under guaranties, rights of set-off and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent), and the right to receive and retain mail, Accounts Receivable payments and other communications of Seller and the right to ticket revenue in respect to transportation or other services performed but unbilled or uncollected as of the Closing, provided, moreover, all deposits provided to any utility provider under Section 366 of the Bankruptcy Code shall be payable to Purchaser upon termination of the utility service;

(h)     to the extent that such lease (and any such agreement related thereto, if any) is an Assigned Contract, all rights under a lease (and any agreement related thereto) for a Leased Property, in each case together with all interests in and to all Improvements and fixtures located thereon or attached thereto, and other appurtenances thereto, and rights in respect thereof;

(i)     all aircraft, engines and propellers;

(j)     all real property and real property fixtures;

(k)     all information technology systems;

3

(l)     all office furniture and furnishings;

(m)     all pre-Closing ticket and freight sales, charter payments, and proceeds for flights to be flown post-Closing;

(n)     all Ground Support Equipment and other FF&E, including without limitation the assets identified in **Schedule 2.1(n)**;

(o)     all Intellectual Property;

(p)     all Assigned Contracts;

(q)     all Permits, to the extent assignable;

(r)     all manuals for FAA 14 CFR Part 121 operating certificate, FAA 14 CFR Part 135 operating certificate, and other FAA operating certificates;

(s)     all recoverable mail and freight receivables and overpayments of any governmental taxes, fees and charges;

(t)     except to the extent that such insurance policy is an Excluded Asset under **Section 2.2(f)** below and to the extent assignable, all rights under or arising out of all insurance proceeds and insurance policies relating to the Business or any of the Acquired Assets (including, without limitation, returns and refunds of any premiums paid, or other amounts due back to Seller, with respect to cancelled policies), unless non-assignable as a matter of Law;

(u)     all motor vehicles owned by Seller;

(v)     all rights under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees and agents of Seller or with third parties (including, without limitation, any non-disclosure or confidentiality, non-compete, or non-solicitation agreements entered into in connection with the Auction);

(w)     Assigned or potential Causes of Action, settlements, or litigation awards;

(x)     to the extent assignable, all rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, contractors and any other Person to the extent relating to products or services purchased by or provided, to Seller or to the extent affecting any Acquired Assets, other than any warranties, representations and guarantees pertaining to any Excluded Assets;

(y)     all books and records of Seller (excluding Seller's corporate books and records and corporate, financial and Tax records, work papers and other records that Seller is required by Law to retain, copies of which, however, shall be provided to Purchaser upon request);

(z)     [reserved];

(aa)     all bank accounts, checkbooks and cancelled checks of Seller;

4

(bb)   all Data and Documents;

(cc)   all (or the benefit of all, to the extent not assignable) Tax refunds, rebates, credits and similar items of Seller, in each case relating to any period, or portion of any period, on or prior to the Closing Date or any Tax Return;

(dd)   all telephone numbers, fax numbers, e-mail addresses, websites, URLs and internet domain names;

(ee)   all goodwill of the Business;

(ff)   all prepaid assets;

(gg)   the Aircraft Leases, but only to the extent that they are Assigned Contracts;

(hh)   all notes receivable of the Seller; and

(ii)   other assets related to, associated with or used in the conduct of the Business and/or the Acquired Assets, excepting therefrom only the Excluded Assets.

If Purchaser desires to assume the rights or other benefits relating to Assigned Contracts, manufacturer warranties, guaranties or Permits which in any such case are non-assignable, Seller will use its best reasonable efforts to seek the necessary consents to such assignment, and failing to obtain such consent, will, at Purchaser's option, sublease or otherwise arrange or make available the benefits and use thereunder to Purchaser after Closing in such manner and by such means as Purchaser may reasonably request.

Section 2.2   Excluded Assets.   Notwithstanding anything to the contrary in this Agreement, nothing herein shall be deemed to sell, transfer, assign or convey any of the Excluded Assets to Purchaser; Purchaser hereby disclaims all liability or responsibility with respect to any of the Excluded Assets; and Seller shall retain all right, title and interest to, in and under, and all obligations with respect to the Excluded Assets. For all purposes of and under this Agreement, and as the same may be amended pursuant to **Section 2.6**, the term "**Excluded Assets**" shall consist of the following items and assets:

(a)   any asset of Seller that would constitute an Acquired Asset but for the fact that it is conveyed, leased or otherwise disposed of, in the Ordinary Course of Business prior to the Closing Date not in violation of this Agreement;

(b)   the corporate books and records of the Seller and corporate proceedings, financial and Tax records, work papers and other records that Seller is required by Law to retain; provided, however, copies of the foregoing items shall be provided by Seller to Purchaser upon request;

(c)   the rights of Seller under this Agreement and all Cash and non-Cash consideration payable or deliverable to Seller under this Agreement;

(d)   Cash;

5

(e)        all rights under or arising out of insurance policies not relating to the Business or the Acquired Assets;

(f)        all Tax attributes of Seller;

(g)        all Rejected Contracts;

(h)        all Causes of Action arising under Chapter 5 of the Bankruptcy Code that are not Assigned Causes of Action;

(i)        except for the Assumed Employee Liabilities, all Employee Benefit Plans; and

(j)        Permits that are not assignable; and

(k)        the Alaska Airlines Contracts other than the Passenger Services Agreement for (BOS).

Section 2.3        Assumption of Liabilities.  Upon the terms and subject to the conditions of this Agreement, Purchaser shall, effective at the time of the Closing, assume and agree to discharge and perform when due, the liabilities and obligations of Seller (and only those liabilities and obligations of Seller) which are enumerated in this **Section 2.3** (the "**Assumed Liabilities**"):

(a)        certain of Seller's liabilities and obligations under the Assigned Contracts, as more fully set forth in Bankruptcy Court's order authorizing the Seller to assign the Assigned Contracts;

(b)        all liabilities and obligations relating to (i) ordinary accruals for wages, commissions, expense reimbursements and severance obligations, and liabilities of the Retained Employees, that accrued for the period after the Closing, (ii) ordinary accruals for vacation days and sick days of the Retained Employees that accrued for the period prior to and after the Closing, (iii) worker's compensation claims of the Retained Employees arising from incidents that occur after the Closing, (iv) the exempt or non-exempt status of any Employee for the period after the Closing, and (v) litigation, including without limitation any claims for wrongful termination, any claims under Title VII of the Civil Rights Act of 1964, as amended, or similar state Law, and any whistleblower claims with respect to Retained Employees for the period after the Closing (collectively, the "**Assumed Employee Liabilities**");

(c)        those specific liabilities and obligations of Seller (if any) arising under Environmental Laws identified on **Schedule 2.3(c)** (the "**Assumed Environmental Liabilities**");

(d)        the air traffic liability for passenger tickets sold before the Closing Date for all routes that Seller was serving as of the Closing Date; and

(e)        the outstanding liabilities and obligations arising out of Seller's healthcare plans that accrued prior to and after the Closing and payment of the premium under Seller's stop-loss policy.

6

Section 2.4    <u>Excluded Liabilities</u>.  All claims against Seller, and all liabilities and obligations of Seller (in each case of any nature whatsoever, whether direct or indirect, matured or unmatured, known or unknown, absolute, accrued, contingent or otherwise, whether now existing or hereafter arising) which are (x) enumerated below in this **Section 2.4** or (y) not specifically assumed by Purchaser pursuant to **Section 2.3** are collectively referred to herein as the "**Excluded Liabilities**." Purchaser shall not assume, be deemed to have assumed, or otherwise be responsible or liable for, any of the Excluded Liabilities. Excluded Liabilities include, but shall not be limited to:

(a)    any and all liabilities arising under any Aircraft Lease and under any aircraft engine, propeller or spare parts lease not assumed by Purchaser pursuant to **Section 2.3(a)**;

(b)    any and all liabilities arising under any Station Lease not assumed by Purchaser pursuant to **Section 2.1(c)**;

(c)    any and all liabilities and obligations for Taxes, including but not limited to sales Taxes, use Taxes, payroll Taxes, real property Taxes, personal property Taxes, *ad valorem* Taxes and other Taxes, arising from or with respect to the Acquired Assets or the Business to the extent attributed to the operation of the Acquired Assets or the Business on or before the Closing Date or the transactions contemplated by this Agreement;

(d)    any and all liabilities for indebtedness of Seller with respect to borrowed money other than (x) obligations with respect to capitalized leases, if any, that are Assigned Contracts and (y) any of the Obligations assumed pursuant to **Section 2.3**;

(e)    except for the Assumed Environmental Liabilities, any and all liabilities and obligations arising under any Environmental Law or any and all liabilities and obligations arising under any other Law (including as a result of any action or inaction of Seller or of any third party) relating to the storage, use or operation of the Acquired Assets;

(f)    any and all liabilities and obligations for any violation of any Law;

(g)    any and all liabilities and obligations for: (i) costs and expenses incurred by Seller or owed in connection with the administration of the Bankruptcy Case (including, without limitation, the fees and expenses of attorneys, accountants, financial advisors, consultants and other professionals retained by Seller, and the official creditors' committee, the fees and expenses of the post-petition lenders and pre-petition lenders incurred or owed in connection with the administration of the Bankruptcy Case); and (ii) all costs and expenses of Seller incurred in connection with the negotiation, execution and consummation of the transactions contemplated under this Agreement;

(h)    any and all liabilities and obligations of Seller to the extent that its existence or magnitude constitutes or results in a breach of a representation, warranty or covenant made by Seller to Purchaser under this Agreement, or makes the information contained in any Schedule incorrect or incomplete;

(i)      any liabilities of Seller under those Contracts and Permits which constitute Excluded Assets or which are not assigned to Purchaser pursuant to the provisions of this Agreement;

(j)      any and all liabilities and obligations (i) that are the subject of any dispute, litigation, arbitration, judgment, order, decree or other civil, criminal, or other proceeding as of the Closing Date, (ii) with respect to periods prior to the Closing Date and are or could be asserted as a claim in litigation or arbitration after the Closing Date, (iii) relating to any bodily injury, or damage to property, incurred by any Person, or (iv) arising as a result of actions or omissions with respect to services provided to customers prior to the Closing;

(k)      any liabilities or obligations which Purchaser may or could become liable for as a result of or in connection with any "**de facto merger**", "**successor-in-interest**", or other successor liability theories;

(l)      those specific liabilities and obligations of Seller identified on **Schedule 2.4(l)** attached hereto;

(m)      except for the Assumed Employee Liabilities, all liabilities or obligations arising under any Employee Benefit Plan;

(n)      any liability or obligation of Seller to its stockholders or other equity holders or affiliates;

(o)      any costs and expenses that may be recovered from the Acquired Assets on account of the operation of Section 506(c) of the Bankruptcy Code;

(p)      any liabilities arising out of any representations, warranties, actions or failure to act by Seller in connection with any Assigned Contract, including any claims by any Person other than the counter-party to such Assigned Contract;

(q)      except for the Assumed Employee Liabilities, any liabilities and obligations relating to Employees, including but not limited to: (i) ordinary accruals for wages, commissions, vacation days, sick days, expense reimbursements and severance obligations and liabilities of the Employees that accrued for the period prior to the Closing, (ii) worker's compensation claims for Employees which remain unpaid as of the Closing Date (whether reported or not), (iii) the exempt or non-exempt status of any Employee for the period prior to the Closing, (iv) litigation, including without limitation any claims for wrongful termination, any claims under Title VII of the Civil Rights Act of 1964, as amended or similar state Law, and any whistleblower claims with respect to any Employee for the period prior to the Closing, (v) those liabilities and obligations retained by Seller in accordance with **Section 2.4** and **Section 6.4**; and

(r)      without limitation by the specific enumeration of the foregoing, any and all liabilities and obligations of Seller or arising out of or related to the Acquired Assets or the Business that are not expressly assumed by Purchaser pursuant to the provisions of **Section 2.3**.

Section 2.5    Assignment and Assumption of Contracts.

(a)    Assignment and Assumption at Closing.

(i)    **Schedule 2.5(a)** attached hereto sets forth (x) each Contract to which Seller is a party or by which Seller is bound and that is used in or related to the Business or any of the Acquired Assets, (y) all Cure Amounts (if any) for each such Contract, and (z) a detailed description of each such Contract (such schedule is referred to herein as the "**Contracts Schedule**").

(ii)    Purchaser has, by delivering written notice to Seller, designated each Contract on the Contracts Schedule as "**Assumed**," "**Rejected**" or "**Held**." Each Contract so designated as "**Assumed**" is referred to herein as an "**Assumed Contract**"; each Contract so designated as "**Rejected**" is referred to herein as a "**Rejected Contract**"; and each Contract designated as "**Held**" is referred to herein as a "**Held Contract**." Notwithstanding the foregoing, Purchaser shall have the right (in its sole and absolute discretion) to change any designation of a Rejected or Held Contract to an Assumed Contract and to notify Seller in writing of any such change until Closing in which case such Contract shall become an Assumed Contract as indicated by such changed designation. Except for the Passenger Services Agreement for (BOS) between Alaska Airlines, Inc. and the Seller, the Alaska Airlines Contracts are not Assigned Contracts or Assumed Contracts.

(iii)    Seller has provided timely and proper written notice of the Bankruptcy Court's Order on Chapter 11 Trustee's Motion for Entry of an Order (A) Authorizing the Assumption and Assignment of Executory Contracts and Unexpired Lease, (B) Approving Cure Amounts, and (C) Granting Related Relief dated August 31, 2018 (ECF No. 473) which includes the procedures for the assumption and assignment of Contracts to parties to all Contracts and will take all other actions necessary to cause all Assumed Contracts to be assumed by Seller (to the extent not already assumed pursuant to prior Bankruptcy Court order(s)) and assigned to Purchaser, and all Rejected Contracts to be rejected by Seller, pursuant to Section 365 of the Bankruptcy Code, provided that the only Contracts to be actually assumed and assigned to Purchaser at Closing will be the Assumed Contracts. Purchaser shall, at or prior to Closing, comply with all requirements under Section 365 of the Bankruptcy Code necessary to assign to Purchaser the Assumed Contracts.

(iv)    At Closing, (x) Seller shall, pursuant to the Bankruptcy Sale Order and the Assignment and Assumption Agreement(s) and other transfer and assignment documents requested by Purchaser, assume (to the extent not already assumed pursuant to prior Bankruptcy Court order(s)) and assign to Purchaser (the consideration for which is included in the Purchase Price) each of the Assumed Contracts and (y) except as set forth in this subsection, Purchaser shall pay promptly all Cure Amounts (if any) in connection with such assumption and assignment (as agreed to among Purchaser and Seller or as determined by the Bankruptcy Court) and assume and agree to perform and discharge the Assumed Liabilities (if any) under the Assumed Contracts, pursuant to the Assignment and Assumption Agreement(s).

(b)    Assumed Contracts.

(i)    At the Closing, Seller shall promptly cause all Rejected Contracts and all Held Contracts not designated as "Assumed" by Purchaser during the Designation Period, or subject to treatment as Nonassignable Assets pursuant to **Section 2.5(c)** hereof, to be rejected pursuant to Section 365 of the Bankruptcy Code at or as soon after Closing as practicable.  Notwithstanding the foregoing, with respect to any Held Contracts treated as Nonassignable Assets pursuant to **Section 2.5(c)** hereof, Seller shall not reject such Held Contracts until Purchaser provides Seller with written notice that it no longer seeks the benefit of such Held Contract or Held Contracts under **Section 2.5(c)(ii)** hereof, after which time Seller shall cause such Held Contract or Held Contracts to be rejected as soon as practicable.

(ii)    On each date that each Assumed Contract is assumed and assigned to Purchaser pursuant to this **Section 2.5** (including, without limitation, the approval of the assumption and assignment thereof by the Bankruptcy Court), such Assumed Contract shall constitute an "**Assigned Contract**" and shall be an Assigned Contract for all purposes under this Agreement, provided that no Assumed Contract shall be assigned or transferred pursuant to this Agreement unless the Bankruptcy Court has previously approved the assumption and assignment thereof to Purchaser.

(c)    Non-Assignment of Contracts and Permits.

(i)    Notwithstanding anything contained in this Agreement to the contrary, Seller shall not be required to assign or transfer any Contract or any Permit, if, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, an attempt at assignment or transfer thereof, without the consent or approval required or necessary for such assignment or transfer, would constitute a breach thereof, require the payment of any cure amount that exceeds, in Purchaser's judgment, Purchaser's cost to find an alternative to such Contract or Permit, or in any way adversely affect any of the rights of Purchaser (unless the restrictions on assignment or transfer thereunder would be rendered ineffective pursuant to Sections 9-406 through 9-409, inclusive, of the Uniform Commercial Code, as amended) as the assignee or transferee of such Contract or Permit (as the case may be) thereunder (such Contract or Permit being a "**Nonassignable Asset**").  If, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code and the efforts of Seller in accordance with the covenant set forth in **Section 6.1(c)(xiii)**, such consent or approval is required but not obtained with respect to an Assumed Contract or a Permit, neither Seller nor Purchaser shall be in breach of this Agreement nor shall the Purchase Price be adjusted nor (but subject to Purchaser's termination right set forth in **Section 11.1(c)(vii)**) shall the Closing be delayed in respect of the Assumed Contracts or the Permits.  From and after the date hereof, including through and after the Closing, Seller shall use its best reasonable efforts to obtain all consents or approvals that are required with respect to Assumed Contracts and Permits, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, for Seller to assume and assign to Purchaser such Contracts and Permits. For the avoidance of doubt, nothing in this **Section 2.5(b)** shall be deemed to (x) limit the

10

liability, if any, of Seller pursuant to this Agreement for failing to have obtained any required consent or approval or (y) alter or limit any rights of Purchaser under **Section 11.1(c)(x)** of this Agreement.

(ii)      To the extent permitted by Law, if consents to the assignment of any Nonassignable Asset cannot be obtained or cure amounts cannot be negotiated prior to the Closing, and upon delivery of an indemnity from Purchaser protecting the Seller from liability therefor, the Seller shall use its best efforts to provide Purchaser with the benefits under any such Nonassignable Asset in accordance with the terms thereof and the use of any other asset including entering into subcontracts, subleases, sale and leasebacks, use and service agreements or other contractual arrangements that will provide such benefits to Purchaser.  Seller shall promptly pay over to Purchaser, in respect of each Nonassignable Asset, all money or other consideration received by Seller under the terms of such Nonassignable Asset.

Section 2.6      Right to Change Designations.  Notwithstanding anything contained in this Agreement to the contrary, Purchaser reserves the right, and shall have the right, to designate in one or more written notices delivered to Seller (i) at any time prior to the Closing Date, any Acquired Asset as an Excluded Asset and (ii) at any time prior to two days prior to the commencement of the Auction, any Excluded Asset as an Acquired Asset, except to the extent otherwise provided in **Section 2.5**.

## ARTICLE 3
## CONSIDERATION

Section 3.1      Good Faith Deposit.

(a)      The Purchaser has deposited with the Escrow Agent as a good-faith deposit the amount of $550,000 (the "**Deposit**").  The Escrow Agent shall hold the Deposit in a segregated bank account.  The Seller acknowledges and agrees that the Deposit shall not be an asset of the Seller's bankruptcy estate.  Upon the Closing in accordance with the terms of this Agreement and the Ancillary Agreements, the Deposit will be applied against the Purchase Price in the manner provided in **Section 3.2**.

(b)      If this Agreement is terminated pursuant to **Section 11.1**, the Seller and the Purchaser shall direct the Escrow Agent to return the Deposit to the Purchaser or to disburse the Deposit to the Seller as a non-completion fee in accordance with **Section 11.2(b)**.

Section 3.2      Purchase Price.  In consideration of the sale of the Business and the Acquired Assets to Purchaser, and in reliance upon the representations, warranties, covenants and agreements of Seller set forth herein, and upon the terms and subject to the conditions set forth herein, the purchase price for the Business and the Acquired Assets shall be equal to the sum of the following (collectively, the "**Purchase Price**"):

(a)      Twelve Million, Three Hundred Thousand Dollars ($12,300,000);

(b)     A reduction in the claim filed on or about October 3, 2018, by Turbo Lease LLC and acquired by Purchaser, to the extent such claim is allowed, of Six Hundred Fifty Five Thousand Dollars ($655,000); plus

(c)     the assumption of the Assumed Liabilities.

Section 3.3     Allocation of Purchase Price.

(a)     Within the earlier of (i) 180 days after the Closing Date and (ii) 20 days prior to the extended due date of the Tax Returns to which IRS Form 8594 must be attached, Purchaser shall deliver to Seller a statement (the "**Allocation Statement**") allocating, for tax purposes, the consideration paid by Purchaser for the Acquired Assets among the Acquired Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder.

(b)     The parties to this Agreement hereby agree to (i) be bound by the Allocation Statement (other than if Seller reasonably disagrees with the Allocation Statement, then the parties will work in good faith to resolve such disagreement), (ii) act in accordance with the Allocation Statement in connection with the preparation, filing and audit of any Tax Return (including, without limitation, in the filing of IRS Form 8594 and any other corresponding Tax forms), and (iii) take no position inconsistent with the Allocation Statement for any Tax purpose (including, without limitation, in any audit, judicial or administrative proceeding).

**ARTICLE 4**
**REPRESENTATIONS AND WARRANTIES OF SELLER**

Seller hereby represents and warrants to Purchaser:

Section 4.1     Organization.

(a)     Seller is a corporation duly organized, validly existing and in good standing under the Laws of the State of Alaska and has all necessary power and authority to own, lease and operate its properties and to conduct its business in the manner in which its business is currently being conducted. Except as a result of the commencement of the Bankruptcy Case, Seller is qualified to do business and is in good standing in all jurisdictions where it owns or leases real property in connection with the operation of the Business or otherwise conducts the Business, except where the failure to so qualify or to so be in good standing has not had and would not reasonably be expected to have a Material Adverse Effect.

(b)     Seller does not hold any equity or other interests in any other Person. Seller conducts no business other than the ownership and management of the Business.

Section 4.2     Authorization of Agreement.  Subject to entry of the Bankruptcy Sale Order and authorization as is required by the Bankruptcy Court:

(a)     Seller has, or at the time of execution will have, all necessary corporate power and authority to execute and deliver this Agreement and each Ancillary Agreement to which Seller is or will become a party and to perform its obligations hereunder and thereunder;

(b)      the execution and delivery of this Agreement and each Ancillary Agreement to which Seller is or will become a party and the performance of Seller's obligations hereunder and thereunder (including, without limitation, the consummation of the transactions contemplated by this Agreement) have been, or at the time of execution will be, duly authorized by all necessary corporate action on the part of Seller and no other corporate proceedings on the part of Seller are necessary to authorize such execution, delivery and performance; and

(c)      this Agreement and each Ancillary Agreement to which Seller is or will become a party have been, or when executed will be, duly and validly executed and delivered by Seller and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement and each Ancillary Agreement to which Seller is or will become a party constitutes, or will constitute, when executed and delivered, the valid and binding obligations of Seller enforceable against Seller in accordance with its respective terms, subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

Section 4.3      Conflicts; Consents of Third Parties.

(a)      Except as set forth on **Schedule 4.3(a)**, the execution, delivery and performance by Seller of this Agreement and each Ancillary Agreement to which Seller is or will become a party, the consummation of the transactions contemplated hereby and thereby, or compliance by Seller with any of the provisions hereof and thereof do not, or will not, result in the creation of any Lien upon the Acquired Assets and do not, or will not, conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provisions of:

(i)      Seller's articles of incorporation and by-laws, or comparable organizational documents of Seller;

(ii)      subject to entry of the Bankruptcy Sale Order, any Contract or Permit to which Seller is a party or by which any of the Acquired Assets are bound;

(iii)      subject to entry of the Bankruptcy Sale Order, any order, writ, injunction, judgment or decree of any Governmental Authority applicable to Seller or any of the properties or assets of Seller as of the date hereof; or

(iv)      subject to entry of the Bankruptcy Sale Order, any applicable Law.

(b)      Subject to entry of the Bankruptcy Sale Order, except as set forth on **Schedule 4.3(b)**, no consent, waiver, approval, order, Permit or authorization of, or declaration, filing or registration with, or notification to, any Person or Governmental Authority is required on the part of Seller in connection with the execution, delivery and performance of this Agreement or any Ancillary Agreement to which it is or will become a party, the compliance by Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby, or the assignment or conveyance of the Acquired Assets or the assumption of the Assumed Liabilities.

13

Section 4.4    Title to the Acquired Assets.  Seller has good and valid title to the Acquired Assets free and clear of all Liens, Claims, Interests and Encumbrances, other than any exceptions expressly set forth on **Schedule 4.4** hereto (the "**Permitted Exceptions**") and Permitted Liens, and Purchaser will be vested, to the maximum extent permitted by Sections 363 and 365 of the Bankruptcy Code, with good, valid, marketable and undivided title to the Acquired Assets free and clear of all Liens, Claims, Interests and Encumbrances, other than Permitted Exceptions and Permitted Liens.

Section 4.5    Contracts.  **Schedule 2.5(a)** includes a complete list, as of the date hereof, of all Contracts to which Seller is a party or by which it is bound and that are used in or related to the Business or the Acquired Assets.  Seller has provided to Purchaser true and complete copies of such Contracts and any and all amendments, modifications, supplements, exhibits and restatements thereto and thereof in effect as of the date of this Agreement, as well as the Cure Amounts (listing separately both pre-petition and post-petition amounts) with respect to such Contracts.

Section 4.6    Property.  **Schedule 4.6** sets forth an accurate and complete list of all of the Company's real property, and, if applicable, all liens, mortgages, or other encumbrances upon each parcel of real property. The Company has good and marketable title to all of its properties and assets (whether real, personal or mixed and whether tangible or intangible) that are used in the operation of its business, free and clear of all liens, restrictions or encumbrances. Except as described on **Schedule 4.6**, neither the Seller nor the Business leases, subleases, licenses or otherwise occupies any real property. Seller has provided to Purchaser true and complete copies of the leases, ground leases, subleases and licenses and any and all amendments, modifications, supplements, exhibits and restatements thereto and thereof in effect as of the date of this Agreement relating to the Leased Property.  Seller has provided to Purchaser true and complete copies of all default notices and any other correspondence of a material nature to or from any party to any lease, ground lease, sublease or license relating to the Leased Property.

Section 4.7    Intellectual Property.  Except as set forth on **Schedule 4.7(i)**, (i) with respect to any Intellectual Property owned by Seller (as opposed to Intellectual Property of which Seller is a licensee), Seller has all right, title and interest to all such Intellectual Property, without any conflict known to Seller with the rights of others, (ii) no Person other than Seller has the right to use the Intellectual Property owned by Seller and (iii) Seller has the valid right to use, pursuant to a license, sublicense or other agreement, any Intellectual Property used in Seller's  Business that is owned by a party other than Seller. **Schedule 4.7(ii)** sets forth a complete list, as of the date hereof, of all registered and applied for Intellectual Property owned by Seller (whether registered with the United States Patent and Trademark Office, the United States Copyright Office or otherwise).

Section 4.8    Permits.  **Schedule 4.8(i)** sets forth a complete list, as of the date hereof, of all Permits issued to Seller for the operation of the Business. **Schedule 4.8(ii)** sets forth a complete list, as of the date hereof, of all Permits applied for by Seller or the issuance of which to Seller is pending. Seller represents and warrants that such approvals are in full force and effect and have not been limited, revoked or modified in any manner and will continue in full force and effect immediately following the Closing. **Schedule 4.8(iii)** sets forth a complete list, as of the date hereof, of all Permits required for the operation of the Business which have not been issued to Seller or applied for by Seller or the issuance of which to Seller is not pending.

14

Section 4.9    Employee Benefit Plans; Employees.  **Schedule 4.9(i)** sets forth a list as of the Effective Date of each Employee Benefit Plan.  **Schedule 4.9(ii)** sets forth a list as of the Effective Date of all Employees and their respective (a) titles or responsibilities; (b) dates of hire; (c) current base salary or wages; (d) all bonuses paid during 2017; (e) participation status in the Employee Benefit Plans listed on **Schedule 4.9(i)**; and (f) accrued vacation and sick leave.

Section 4.10    Labor Relations.  Except as set forth on **Schedule 4.10**, Seller is not a party to or bound by or has an obligation to perform (including make payments) under any collective bargaining agreement or any Contract with a labor union or labor organization. Seller has not received written notice of any outstanding representation petitions involving Seller before the National Labor Relations Board or any state labor board, and, to the Knowledge of Seller, no such petition has been threatened, and, to the Knowledge of Seller, no labor dispute, strike, picketing, work slowdown, work stoppage or handbilling has been threatened in writing. Seller is not subject to any material unfair labor practice charge.

Section 4.11    Environmental Matters.  Except as set forth on **Schedule 4.11**, the Acquired Assets are in material compliance with all applicable Environmental Laws relating to the protection of the environment, pollution or human health and safety.  Except as set forth on **Schedule 4.11**, at all times, Seller has conducted the Business and the respective operations in accordance with all Environmental Laws applicable to Seller and the Business. Seller has not received written notice of any investigation, suit, claim, action, or proceeding relating to or arising under Environmental Laws with respect to the Acquired Assets or the Business, nor, to the Knowledge of Seller, are any of the same being threatened in writing against Seller or any real property owned, operated, or leased by Seller. Seller has not received any written notice of, or entered into, any obligation, order, settlement, judgment, injunction, or decree involving outstanding requirements relating to or arising under Environmental Laws. Except as set forth on **Schedule 4.11**, to the Knowledge of Seller, there has been no release or threatened release of any Hazardous Material into the environment at, onto, or from any property owned or leased by Seller which would reasonably be expected to result in material liability, costs or Claims relating to any Environmental Law.

Section 4.12    Insurance.    Seller maintains the insurance policies set forth on **Schedule 4.12(i)**, which Schedule sets forth all insurance policies covering the property, assets, employees and operations of the Business (including policies providing property, casualty, liability and workers' compensation coverage). Such policies are in full force and effect and, except as set forth on **Schedule 4.12(ii)**, will continue in full force and effect immediately following the Closing. Seller has paid all premiums on such policies due and payable prior to the Effective Date. Seller has not done anything by way of action or inaction that invalidates any such policies in whole or in part.

Section 4.13    No Brokers or Finders.  Except as set forth on **Schedule 4.13**, no agent, broker, finder or investment or commercial banker, or other Person or firm engaged by, or acting on behalf of, Seller in connection with the negotiation, execution or performance of this Agreement or the transactions contemplated by this Agreement is or will be entitled to any brokerage or finder's or similar fees or other commissions as a result of this Agreement or such transactions.

Section 4.14    Litigation; Proceeding.  Except as set forth in **Schedule 4.14**, there is no material claim, action, suit, proceeding, complaint, charge, hearing, grievance or arbitration pending or, to Knowledge of Seller, threatened against or related to the Business, whether at law or in equity, whether civil or criminal in nature or by or before any arbitrator or Governmental Authority, nor are there any investigations relating to the Business, pending or, to Knowledge of Seller, threatened by or before any arbitrator or any Governmental Authority. None of the Acquired Assets is subject to any judgment, injunction, order, consent, or decree of any Governmental Authority or any arbitration award or settlement agreement with any Person.

Section 4.15    Compliance with Laws.  Except as set forth on **Schedule 4.15(i)**, Seller (i) has complied with, is in compliance with and has operated the Business in compliance with all applicable Laws and Permits (exclusive of Tax law compliance to the extent disclosed in **Schedule 4.16**) in all material respects, and (ii) holds all Permits necessary for the lawful conduct of the Business by Seller. Except as set forth on **Schedule 4.15(ii)**, Seller has not received any written notice or other written communication from any Governmental Authority or other Person (x) asserting any violation of, or failure to comply with, any requirement of any Law or Permit or (y) notifying Seller of the non-renewal, revocation or withdrawal of any Permit. Seller is in material compliance with the terms of the Permits.

Section 4.16    Taxes.  Except as set forth on **Schedule 4.16**, (A) none of the Acquired Assets is tax-exempt use property within the meaning of Section 168(h) of the Code; (B) all Taxes shown on such Tax Returns and all Trust Fund Taxes owing by Seller have been or will be paid in a timely fashion or have been accrued  for on the Seller' financial statements; (C) there are no Liens for any Tax on the Acquired Assets, except for Taxes not yet due and payable; and (D) Seller is not a foreign person as defined in Treasury Regulation section 1.445-2(b)(2)(i).

Section 4.17    Financial Statements.

(a)    Seller has provided to Purchaser (i) the unaudited consolidated balance sheet of the Seller and the related consolidated statements of income, stockholders' equity and cash flow for the fiscal year ended March 31, 2017, and (ii) the monthly unaudited consolidated balance sheets of the Seller for the months beginning April 2017 through May 2018 and the related consolidated statements of income, stockholders' equity and cash flow for each such month. The Financial Statements have been prepared from the books and records of Seller, have been prepared in accordance with generally accepted accounting principles (except as may be stated in the notes thereto) and fairly present the financial position and the results of operations and cash flows of Seller as of the times and for the periods referenced to therein.

(b)    **Schedule 4.17** contains an aged list of the Accounts Receivable of the Seller as of the Effective Date.  All such Accounts Receivable arose from, and all Accounts Receivables of the Seller existing as of the Closing Date will have arisen from, the delivery of products or services in its Ordinary Course of Business.

Section 4.18    Citizenship.  Seller is a "citizen of the United States" as defined in the Federal Aviation Act, and Seller is an "air carrier" within the meaning of such Act operating under certificates issued pursuant to such Act (49 U.S.C. §§ 41101-41112).

Section 4.19    <u>Station Leases and Equipment</u>.

(a)    **Schedule 4.19** sets forth the aggregate amount of airline fees and charges paid and payable (if different) by Seller to the lessor or Governmental Authority under the Station Leases with respect to calendar years 2016, 2017 and 2018.

(b)    **Schedule 2.5(a)** includes a true, correct and complete list of all leases, subleases, use agreements, licenses, permits, certificates or other documents or agreements under which Seller leases or occupies any location subject to a Station Lease, in each case, including identification of the applicable lease expiration date.

(c)    **Schedule 2.5(a)** includes a true, correct and complete list of all the leases, subleases, use agreements, licenses, permits, certificates or other documents or agreements under which Seller leases, occupies or otherwise has the right to use any Ground Support Equipment included in the Transferred Assets, and all amendments thereto (the "**Ground Equipment Leases**"), in each case, including identification of the Seller and the lease expiration date.

(d)    **Schedule 2.1(n)** includes all the Station Property owned by Seller (together with the Ground Support Equipment owned by Seller, the "**Owned Station Items**").

(e)    Except as set forth in **Schedule 4.19(e)** identifying the specific equipment and specific condition or non-compliance, the Owned Station Items are all in good operating condition and repair, subject to normal wear, are usable in the regular and Ordinary Course of Business and, to Seller's Knowledge, conform to applicable Laws.

(f)    The Station Leases are in full force and effect, and except by reason of the filing of the Bankruptcy Case or the insolvency of Seller, Seller has no Knowledge of any material default under the Station Leases or of any condition or event which has occurred which with notice or the passage of time or both would constitute a material default, by Seller under the Station Leases which has not been disclosed to Purchaser.

(g)    Seller has not received any notice that any portion of the Owned Station Items is or will be subject to, or affected by, any condemnation, eminent domain or similar proceeding and there are no material violations of record or otherwise known to Seller against any portion of the Owned Station Items.

(h)    With respect to the Owned Station Items which Purchaser elects to purchase pursuant to **Section 2.1(c)** hereof, the Seller has, and at the Closing, Seller shall convey to Purchaser, good, valid and indefeasible title thereto free and clear of all Liens other than Permitted Liens, and with respect to Station Leases Purchaser elects to acquire, the Seller has and at the Closing, Seller shall assign to Purchaser valid rights to the lessee's interest thereunder.

(i)    Set forth on **Schedule 2.5(a)** is a list of all service, supply and other agreements to which Seller is a party or by which they are bound and which, to the Knowledge of Seller, are in effect on the Effective Date relating to services provided by any Person to support Seller's operations or operations under or in connection with each Station Lease (collectively, the "**Service Agreements**").

17

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller as follows:

Section 5.1    Organization.  Purchaser is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all requisite corporate power and authority to own its properties and assets and to conduct its businesses as now conducted.

Section 5.2    Authorization and Validity.  Purchaser has, or at the time of Purchaser's execution of such Ancillary Agreement will have, all necessary corporate power and authority and legal capacity to execute and deliver this Agreement and any Ancillary Agreement to which Purchaser is or will become a party and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and any Ancillary Agreement to which Purchaser is or will become a party and the performance of Purchaser's obligations hereunder and thereunder (including, without limitation, the consummation of the transactions contemplated by this Agreement) have been, or at the time of execution will be, duly authorized by all necessary action by the board of directors (or similar governing body) of Purchaser, and no other corporate proceedings on the part of Purchaser is necessary to authorize such execution, delivery and performance. This Agreement and each Ancillary Agreement to which Purchaser is or will become a party have been, or at the time of execution will be, duly executed by Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement and each Ancillary Agreement to which Purchaser is or will become a party constitutes, or will constitute, when executed and delivered, Purchaser's valid and binding obligations, enforceable against Purchaser in accordance with their respective terms, subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

Section 5.3    No Conflict or Violation.  The execution, delivery and performance by Purchaser of this Agreement and any Ancillary Agreement to which Purchaser is or will become a party do not or will not at the time of execution (a) violate or conflict with any provision of the organizational documents of Purchaser, (b) violate any provision of applicable Law, or any order, writ, injunction, judgment or decree of any court or Governmental Authority applicable to Purchaser or (c) violate or result in a breach of or constitute (with due notice or lapse of time, or both) an event of default or default under any Contract to which Purchaser is a party or by which Purchaser is bound or to which any of Purchaser's properties or assets are subject, in each case, other than any violation, conflict, breach, event of default or default that would not reasonably be expected to adversely affect Purchaser's ability to perform its obligations under this Agreement on a timely basis.

Section 5.4    Consents and Approval.  Except with respect to the issuance of: (i) the Bankruptcy Sale Order; (ii) the DOT final approval of the 49 U.S.C. §41105 transfer of Seller's 49 U.S. C. §41102 Certificate of Public Convenience and Necessity; (iii) completion of the FAA Part 135 Air Carrier Certification Process and such Certificate re-issuance procedures as FAA might determine and final re-issuance of a Part 135 Certificate; or (iv) as otherwise as set forth on **Schedule 5.4**, no consent, waiver, authorization or approval of any Person and no declaration to or filing or registration with any Governmental Authority is required in connection with the

execution and delivery by Purchaser of this Agreement and each Ancillary Agreement to which Purchaser is or will become a party or the performance by Purchaser of its obligations hereunder or thereunder.

Section 5.5    Financing.  On the Closing Date Purchaser will have readily available funds in such amount as is required to consummate the transactions contemplated hereunder on the terms set forth herein and otherwise to perform all of Purchaser's obligations under this Agreement.

Section 5.6    Litigation.  There is no action, suit, proceeding or claim that is pending or, to Purchaser's knowledge, threatened in any court or by or before any Governmental Authority that would adversely affect Purchaser's ability to perform its obligations under this Agreement on a timely basis.

Section 5.7    No Other Representations and Warranties.  Except for the representations and warranties contained in this ARTICLE 5, neither Purchaser nor any other Person authorized by Purchaser makes any other express or implied representation or warranty on behalf of Purchaser.

## ARTICLE 6
## COVENANTS AND OTHER AGREEMENTS

Section 6.1    Pre-Closing Covenants of Seller.  Seller covenants to Purchaser that, during the period from and including the Effective Date through and including the Closing Date or the earlier termination of this Agreement in accordance with the provisions of **ARTICLE 11**:

(a)    Cooperation. Seller shall, without payment of funds to counterparties, use its reasonable best efforts to obtain, and assist Purchaser in obtaining, at no cost to Purchaser (other than Cure Amounts payable at or after the Closing), such consents, waivers or approvals of any third party or Governmental Authority required for the consummation of the transactions contemplated hereby, including the sale and assignment of the Acquired Assets. Seller shall take, or cause to be taken, all commercially reasonable actions and done, or cause to be done, all things necessary or proper, consistent with applicable Law, to consummate and make effective as soon as possible the transactions contemplated hereby.

(b)    Access to Records and Properties. Seller shall (i) provide Purchaser and its Related Persons reasonable access upon reasonable notice to the facilities, offices and personnel of Seller and to the books and records of Seller, related to the Business or the Acquired Assets or otherwise reasonably requested by Purchaser if reasonably necessary to comply with the terms of this Agreement or the Ancillary Agreements or any applicable Law, including access to perform field examinations and inspections of the Business' or the Acquired Assets' inventories, facilities and equipment; (ii) furnish Purchaser with such financial and operating data and other information with respect to the condition (financial or otherwise), businesses, assets, properties, prospects or operations of Seller as Purchaser shall reasonably request; and (iii) permit Purchaser to make such reasonable inspections and copies thereof as Purchaser may require; provided, however, Purchaser shall use commercially reasonable efforts to prevent any such inspection from unreasonably interfering with the operation of the Business or the duties of any Employee of Seller.

19

(c)     <u>Conduct of Business Prior to Closing</u>. Except as expressly contemplated by this Agreement and except to the extent expressly required under the DIP Credit Agreement, the Bankruptcy Code, other applicable Law or any ruling or order of the Bankruptcy Court and except to the extent waived by Purchaser's prior written consent (which consent may be delivered via electronic mail by any senior officer of Purchaser and may be withheld in Purchaser's sole and absolute discretion), Seller shall ensure that:

(i)     Seller shall not, directly or indirectly, take any action which, if taken, or omit to take any act which, if omitted to be taken, would constitute or result in an Event of Default (as defined in the DIP Credit Agreement) under the DIP Credit Agreement or the DIP Orders;

(ii)     Seller shall not, directly or indirectly, sell or otherwise transfer or dispose, or offer, agree or commit (in writing or otherwise) to sell or otherwise transfer or dispose of any of the Acquired Assets other than the sale of Inventory in the Ordinary Course of Business or the use of cash collateral in accordance with the DIP Credit Agreement or the DIP Orders;

(iii)     Seller shall not, directly or indirectly, permit, offer, agree or commit (in writing or otherwise) to permit, any of the Acquired Assets to become subject, directly or indirectly, to any Lien, Claim, Interest or Encumbrance, except for Permitted Exceptions and Permitted Liens and Liens granted in connection with the DIP Credit Agreement;

(iv)     Seller shall not, directly or indirectly, enter into any transaction or take any other action which, if taken, or omit to take any act which, if omitted to be taken, could be reasonably expected to cause, result in or constitute a breach of any representation or warranty (as if then made) or covenant made by Seller in this Agreement;

(v)     Seller shall notify Purchaser promptly in writing of the occurrence of any Material Adverse Effect;

(vi)     Seller shall not, directly or indirectly, make any promise or representation, oral or written, or otherwise, to (x) increase the annual level of compensation payable or to become payable by Seller to any of its directors, officers or Employees, (y) grant, establish or modify any targets, goals, pools or similar provisions in respect of, any bonus, benefit or other direct or indirect compensation to or for any director, officer or Employee of Seller, or increase the coverage or benefits available under any (or create any new) Employee Benefit Plan or (z) enter into any employment, deferred compensation, severance, consulting, non-competition, non-solicitation or similar agreement (or amend any such current agreement) to which Seller is a party or involving a director, officer or Employee of Seller, except, in each case, as required by Law, or as required by any plans, programs or agreements existing on the Effective Date and disclosed on **<u>Schedule 4.9(i)</u>**;

(vii)     Seller shall comply in all material respects with all Laws applicable to it or having jurisdiction over the Business or any Acquired Asset;

(viii)    Seller shall not, directly or indirectly, (y) enter into any Contract, or (z) assume, amend, modify, supplement or terminate, or waive any rights under, any Contract to which Seller is a party or by which it is bound and that is used in or related to the Business or the Acquired Assets (including any Assigned Contract) or take any affirmative action not required by the terms of any such Contract;

(ix)    Seller shall not, directly or indirectly, cancel, forgive or compromise any debt or claim or waive or release any right of Seller that constitutes an Acquired Asset;

(x)    Seller shall not, directly or indirectly, enter into any commitment for any capital expenditure, except pursuant to any budget approved by the lenders under the DIP Credit Agreement;

(xi)    Seller shall not, directly or indirectly, terminate, amend or modify in any manner any Contract for Leased Property;

(xii)    Seller shall use commercially reasonable efforts to (i) conduct the Business in substantially the same manner as conducted as of the date of this Agreement and only in the Ordinary Course of Business, (ii) preserve the existing business organization and management of the Business intact, (iii) use commercially reasonable efforts to keep available the services of the current Employees, to the extent reasonably feasible, (iv) use commercially reasonable efforts to maintain the existing relations with customers, carriers, distributors, suppliers, creditors, business partners, Employees and others having business dealings with the Business, and (v) refrain from changing in any material respect any of its product or service prices or pricing policies (*e.g.*, discount policies) for any of its products or services;

(xiii)    Seller shall use best reasonable efforts to obtain all consents or approvals prior to the Closing that are required, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, for Seller to assume and assign to Purchaser any Assumed Contract or Permit;

(xiv)    Seller shall use best reasonable efforts to assist Purchaser in obtaining all Permits required to own or operate the Acquired Assets under applicable Laws, including making filings with the Governmental Authorities and issuing powers of attorneys to Purchaser, as necessary;

(xv)    Seller shall not, directly or indirectly, take, or agree, commit or offer (in writing or otherwise) to take or omit to take, any action or actions in violation of the foregoing or which would otherwise adversely affect the consummation of the transactions contemplated hereby;

(xvi)    Seller shall maintain in full force and effect each Permit held by Seller as of the Effective Date or otherwise obtained by Seller prior to the Closing, Seller shall comply with the terms of each such Permit and Seller shall not permit any such Permit to terminate, expire or lapse; and

(xvii)  Seller shall maintain in full force and effect without modification any insurance policy with respect to Acquired Assets, Seller shall comply with the terms of such insurance policy and Seller shall not permit any such policy to terminate, expire or lapse.

(d)    Notice of Certain Events. Seller shall promptly notify Purchaser of, and furnish Purchaser any information it may reasonably request with respect to, the occurrence or nonoccurrence  of any event or condition or the existence of any fact that would reasonably be expected or likely to cause (i) any of the conditions to Purchaser's obligations to consummate the transaction(s) contemplated by this Agreement or by any Ancillary Agreement not to be fulfilled, (ii) any material breach or inaccuracy of any representation or warranty of Seller contained in this Agreement, (iii) Seller's failure to observe or perform any covenant or other obligations set forth in this Article VI; or (iv) directly or indirectly, any Material Adverse Effect on Seller. Notwithstanding the foregoing, the delivery of any notice pursuant to this **Section 6.1(d)** shall not (x) be deemed to amend or supplement any of the Schedules contemplated hereby, (y) be deemed to cure any breach of any representation, warranty, covenant or agreement or to satisfy any condition or (z) limit or otherwise affect the remedies available hereunder to the party receiving such notice.

(e)    Employees. On the Business Day immediately prior to Closing, Seller shall deliver to Purchaser a final **Schedule 4.9(ii)** which will be accurate and complete as of the Closing Date with respect to all information required to be set forth thereon.

Section 6.2    Pre-Closing Covenants of Purchaser.  Purchaser covenants to Seller that, during the period from the Effective Date through and including the Closing or the earlier termination of this Agreement in accordance with the provisions of **ARTICLE 11**:

(a)    Cooperation. Purchaser shall take, or cause to be taken, all commercially reasonable actions and to do, or cause to be done, all things commercially reasonably necessary or proper, consistent with applicable Law, to consummate and make effective as soon as possible the transactions contemplated hereby, provided that the foregoing shall not require Purchaser to participate in the Auction or to make any expenditure of funds or to incur any other obligation or liability.

(b)    Adequate Assurance Regarding Assigned Contracts and Required Orders. Purchaser agrees that it will provide information and cooperate as reasonably requested by Seller to assist in establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code with regard to the Assigned Contracts, provided that the foregoing shall not require Purchaser to make any expenditure of funds or to incur any other obligation or liability except as expressly set forth herein.

(c)    Permits. Purchaser shall use commercially reasonable efforts to cooperate with Seller to obtain or consummate the transfer to Purchaser of any Permit required to own or operate the Acquired Assets under applicable Laws, provided that the foregoing shall not require Purchaser to make any expenditure of funds or to incur any other obligation or liability without its prior consent in Purchaser's sole and absolute discretion.

Section 6.3      Other Covenants of Seller and Purchaser.

(a)      Disclosure Schedules and Supplements. From time to time prior to the Closing Date, Seller, on the one hand, with respect to disclosure schedules relating to Seller, shall notify Purchaser of, and Purchaser on the other hand, with respect to disclosure schedules relating to Purchaser, shall notify Seller of, and shall supplement or amend the disclosure schedules (the "**Schedules**") to this Agreement with respect to, any matter that arises after the Effective Date and that, (i) if existing or occurring at or prior to such delivery of the Schedules, would have been required to be set forth or described in the Schedules to this Agreement or (ii) makes it necessary to correct any information in the Schedules to this Agreement or in any representation or warranty of Seller or Purchaser, as applicable, that has been rendered inaccurate thereby. Each such notification and supplement, to the extent known, shall be made by Seller to the Schedules prepared by Seller no later than two (2) Business Days after discovery thereof by Seller or Purchaser, as applicable, or if such matter arises less than two (2) Business Days before the date set for the Closing by the parties hereto, then promptly after discovery thereof by Seller or Purchaser, as applicable, and in any event prior to the Closing. Notwithstanding the foregoing, (i) nothing contained herein shall detract from or diminish the rights of Purchaser under **Section 9.2(a)** or **Section 11.1(c)(iv)** as if the Schedules were not supplemented or amended pursuant to this **Section 6.3(a)** and (ii) no such supplement or amendment to the Schedules shall be deemed to cure any inaccuracy of any representation or warranty made in this Agreement.

(b)      Personally Identifiable Information. Purchaser shall honor and observe, in connection with the transactions contemplated by this Agreement, any and all policies of Seller in effect on the Petition Date prohibiting the transfer of personally identifiable information about individuals and otherwise comply with the requirements of Section 363(b)(1)(A) of the Bankruptcy Code.

(c)      Access to Records after Closing. From and after the Closing Date, each party hereto shall provide  the other parties hereto (and their respective representatives) with access, at reasonable times and in a manner so as not to unreasonably interfere with their normal business, to the books and records acquired pursuant to this Agreement so as to enable Purchaser and Seller to prepare Tax, financial or court filings or reports, to respond to court orders, subpoenas or inquiries, investigations, audits or other proceedings of Governmental Authorities, and to prosecute and defend legal actions or for other like purposes, including, but not limited to claims objections and resolutions, for a period of two (2) years after the Closing Date. If any party desires to dispose of any such records, such party shall, thirty (30) days prior to such disposal, provide the other party with a reasonable opportunity to remove such records to be disposed of at the removing party's expense.

Section 6.4      Employment Covenants and Other Undertakings.

(a)      Employees. Subject to an interview and other appropriate measures to determine that an Employee is qualified to perform his or her functions to Purchaser's standards, the Purchaser presently intends to offer to employ, effective as of the Closing Date, a significant portion of all Employees who are actively employed in the Business on the Closing Date. Such offers of employment shall be on terms and conditions which are consistent with the Purchaser's policies and procedures and shall be determined by Purchaser in its sole and absolute discretion.

23

Any Employees actually employed by Purchaser are referred to herein as "**Retained Employees**." Seller shall deliver to Purchaser on or before the Closing Date all personnel files and employment records relating to the Retained Employees (including completed I-9 forms and attachments with respect to all Retained Employees, except for such Employees as Seller certifies in writing are exempt from such requirement).

(b)    Other Obligations. Except as otherwise required by Law or otherwise agreed to in writing by Purchaser, neither Purchaser nor any of its Affiliates shall be obligated to provide any severance, separation pay or other payments or benefits to any Employee on account of any termination of such Employee's employment, and all such severance, separation pay and other payments and benefits (if any) shall remain obligations of Seller. Prior to the Closing Date, Seller shall be solely responsible for complying with the WARN Act and any and all obligations under other applicable Laws requiring notice of plant closings, relocations, mass layoffs, reductions in force or similar actions (and for any failures to so comply), in any case, applicable to Employees as a result of any action by Seller or any of its Affiliates prior to the Closing Date. Seller shall remain solely responsible for WARN Act liabilities applicable to the Employees that are incurred on or prior to the Closing Date, including with respect to any Employee terminated prior to the Closing Date that, when aggregated with any Employee who is not hired or who is terminated on or after Closing or for which any WARN Act liability is incurred, results in WARN Act liability with respect to such Employee terminated prior to Closing.

(c)    COBRA.    Seller shall be responsible for the provision of COBRA-continuation coverage with respect to each Employee and his or her dependents and spouse and each other individual who constitutes an "M & A qualified beneficiary" within the meaning of Treasury Regulation Section 54.4980B-9, Q&A-4 in connection with the transactions contemplated by this Agreement.

(d)    Forms W-2 and W-4.    Seller and Purchaser shall adopt the "standard procedure" for preparing and filing IRS Forms W-2 (Wage and Tax Statements) and Forms W-4 (Employee's Withholding Allowance Certificate) regarding the Retained Employees. Under this procedure, Seller shall keep on file all IRS Forms W-4 provided by the Retained Employees for the period required by applicable Law concerning record retention and Purchaser will obtain new IRS Forms W-4 with respect to each Retained Employee.

(e)    No Right to Employment. Nothing herein shall be deemed to create any right to employment or continued employment or to a particular term or condition of employment with Purchaser or any of its Affiliates. Nothing in this **Section 6.4** or any other provision of this Agreement: (i) shall be construed to establish, amend, or modify any benefit or compensation plan, program, agreement or arrangement; (ii) shall limit the ability of Purchaser or any of its Affiliates to amend, modify or terminate any benefit or compensation plan, program, agreement or arrangement at any time assumed, established, sponsored  or maintained by any of them; or (iii) shall be construed to create any third party beneficiary right in any employee or other Person other than the parties to this Agreement.

Section 6.5    Casualty.  If, between the date of this Agreement and the Closing, any of the Acquired Assets shall be destroyed or damaged in whole or in part by hurricane, fire, earthquake, flood, other casualty or any other cause (each a "**Casualty**"), then Purchaser shall have the option

to: (a) acquire such Acquired Assets on an "as is" basis and take an assignment from Seller of all insurance proceeds payable to Seller in respect of the applicable Casualty or (b) in the event that the applicable Casualty would have a Material Adverse Effect, the Purchaser may terminate this Agreement and the transactions contemplated hereby.

Section 6.6    <u>Confidentiality</u>.  The Seller and the Purchaser agree and acknowledge that the Acquired Assets include confidential information of the Business which will be transferred to Purchaser at Closing. From and after Closing; (a) Seller shall, and shall cause each of their respective Affiliates to, hold in confidence all confidential information included in the Acquired Assets and transferred to Purchaser; (b) in the event that Seller or any of its Affiliates shall be legally compelled to disclose any such information, Seller shall provide Purchaser with prompt written notice of such requirement so that Purchaser may seek a protective order or other remedy; and (c) in the event that such protective order or other remedy is not obtained, Seller or its Affiliates shall furnish only such information that is legally required to provide.

Section 6.7    <u>Collection on Acquired Assets</u>.  If, after the Closing Date, Seller shall receive payment with respect to any Acquired Assets, Seller shall immediately deliver such funds or assets to Purchaser and take all steps necessary to vest title to such funds or assets in Purchaser. Seller hereby designates Purchaser and its respective officers as Seller's true and lawful attorney in-fact, with full power of substitution, to execute and endorse for the benefit of Purchaser all checks, notes or other documents received by Seller in payment of or in substitution or exchange for any of the Acquired Assets. Seller hereby acknowledges and agrees that the power of attorney set forth in the preceding sentence in favor of Purchaser is coupled with an interest, and further agrees to execute and deliver to Purchaser from time to time any documents or other instruments requested by Purchaser to evidence such power of attorney.

Section 6.8    <u>Waiver of Bulk Sales Law</u>.  To the greatest extent permitted by applicable Law, Purchaser and Seller hereby waive compliance with the terms of any bulk sales or similar Laws in any applicable jurisdiction in respect to the transactions contemplated by this Agreement. The Bankruptcy Sale Order shall contain a finding by the Bankruptcy Court or shall decree that the Seller and Purchaser are not required to comply with any such Laws.

## ARTICLE 7
## <u>TAXES</u>

Section 7.1    <u>Taxes Related to Purchase of Acquired Assets</u>.

(a)    All transfer, conveyance, recording and similar Taxes, including all such state and local Taxes, incurred in connection with the transfer of the Acquired Assets, and all recording and filing fees (collectively, "**Transaction Taxes**"), that are imposed solely as a result of the sale, transfer, assignment and delivery of the Acquired Assets shall be borne by Purchaser. Purchaser and Seller shall cooperate to (a) determine the amount of Transaction Taxes payable in connection with the transactions contemplated under this Agreement, (b) provide all requisite exemption certificates and (c) prepare and file any and all required Tax Returns for or with respect to such Transaction Taxes with any and all appropriate taxing authorities.

(b)     Seller shall remain responsible for, and Purchaser shall have no liability for, all sales Taxes, use Taxes, payroll Taxes, and other Taxes which are then due and owing with respect to the Acquired Assets or the Business and/or attributable to Tax periods or portions thereof commencing on or after the Petition Date and ending on the Closing Date; provided, however, Seller shall not be obligated to pay any such Tax that is disputed in good faith by Seller, as long as appropriate reserves have been established in accordance with generally accepted accounting principles. All sales Taxes, use Taxes, payroll Taxes, real property Taxes, personal property Taxes and other ad valorem Taxes with respect to the Acquired Assets that accrue during, or attributable to, the period on or prior to the Closing Date and become due on or after the Closing Date shall be paid by Seller. Subject to **Section 7.1(a)**, all sales Taxes, use Taxes, payroll Taxes, real property Taxes, personal property Taxes and other ad valorem Taxes with respect to the Acquired Assets that both accrue and are due after the Closing Date shall be paid by Purchaser.

**ARTICLE 8**

[Reserved]

**ARTICLE 9**
**CONDITIONS PRECEDENT TO PERFORMANCE BY THE PARTIES**

Section 9.1     Conditions Precedent to Performance by Seller.  The obligation of Seller to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which (other than the conditions contained in **Section 9.1(c)**) may be waived by Seller, in its sole and absolute discretion:

(a)     Representations and Warranties of Purchaser.     Each and every representation and warranty of Purchaser made in this Agreement that is qualified by a materiality standard, in each case, shall have been true and correct when made and shall be true and correct as of the Closing Date as if originally made on and as of such Closing Date, and each and every representation and warranty of Purchaser made in this Agreement that is not qualified by a materiality standard, in each case, shall have been true and correct when made in all material respects and shall be true and correct in all material respects as of the Closing Date as if originally made on and as of such Closing Date.

(b)     Performance of the Obligations of Purchaser.     Purchaser shall have performed in all material respects (i) all obligations required under this Agreement that are to be performed by Purchaser on or before the Closing Date (except with respect to (1) obligations which Purchaser is to perform as of the Closing under this Agreement (including, without limitation, the obligation to pay the Purchase Price), Purchaser shall be ready, willing and able to perform such obligations against performance by Seller hereunder and simultaneously with the Closing Purchaser shall so perform such obligations and (2) any obligations qualified by materiality, which obligations shall be performed in all respects as required under this Agreement) and (ii) all obligations required under each Ancillary Agreement to which Purchaser is a party that are to be performed thereunder by Purchaser on or before the Closing Date (except with respect to (I)

26

obligations which Purchaser is to perform as of the Closing under the applicable Ancillary Agreement, Purchaser shall be ready, willing and able to perform such obligations against performance by Seller thereunder and simultaneously with the Closing Purchaser shall so perform such obligations and (II) any obligations qualified by materiality, which obligations shall be performed in all respects as required under the applicable Ancillary Agreement).

   (c) <u>Bankruptcy Court Approval</u>.  The Bankruptcy Sale Order shall have become a Final Order by the Sale Order Deadline.

   (d) <u>No Violation of Orders</u>.  No preliminary or permanent injunction or other order of any court or Governmental Authority or Law that prevents the consummation of the transactions contemplated hereby shall be in effect.

   (e) <u>Bidding Procedures Order</u>.  The Bidding Procedures Order shall have been entered in the Bankruptcy Case and shall have become a Final Order.

   (f) <u>Assumption, Sale and Assignment of Contracts</u>.  The Bankruptcy Court shall have authorized in the Bankruptcy Sale Order the assumption and assignment of the Assumed Contracts.

   (g) <u>Deliverables</u>.  Purchaser shall have delivered or be prepared to deliver all of the items required by **Section 10.3** and all other items required to be delivered by Seller as of the Closing Date pursuant to the terms and conditions of this Agreement.

For avoidance of doubt, there shall be no conditions precedent to Seller's obligation to consummate the transactions contemplated by this Agreement, except for those conditions precedent specifically set forth in this **Section 9.1**.

  Section 9.2 <u>Conditions Precedent to the Performance by Purchaser</u>.  The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which (other than the conditions contained in **Section 9.2(c),** except as expressly provided therein) may be waived by Purchaser, in its sole and absolute discretion:

   (a) <u>Representations and Warranties of Seller</u>. Each and every representation and warranty of Seller made in this Agreement that is qualified by a materiality standard or Material Adverse Effect, in each case, shall have been true and correct when made and shall be true and correct as of the Closing Date as if originally made on and as of such Closing Date, and each and every representation and warranty of Seller made in this Agreement that is not qualified by a materiality standard or Material Adverse Effect, in each case, shall have been true and correct in all material respects when made and shall be true and correct in all material respects as of the Closing Date as if originally made on and as of such Closing Date (disregarding for all purposes of this **Section 9.2(a)** any supplement or amendment to any of the Schedules pursuant to **Section 6.3(a)**).

   (b) <u>Performance of the Obligations of Seller</u>. Seller shall have performed in all material respects (i) all obligations required by Seller under this Agreement that are to be performed by Seller on or before the Closing Date (except with respect to (1) obligations which

Seller is to perform as of the Closing under this Agreement, Seller shall be ready, willing and able to perform such obligations against performance by Purchaser hereunder and simultaneously with the Closing, Seller shall so perform such obligations and (2) any obligations qualified by materiality, which obligations shall be performed in all respects as required under this Agreement) and (ii) all obligations required under each Ancillary Agreement to which Seller is a party that are to be performed thereunder by Seller on or before the Closing Date (except with respect to (I) obligations which Seller are to perform as of the Closing under the applicable Ancillary Agreement, Seller shall be ready, willing and able to perform such obligations against performance by Purchaser thereunder and simultaneously with the Closing Seller shall so perform such obligations and (II) any obligations qualified by materiality, which obligations shall be performed in all respects as required under the applicable Ancillary Agreement).

(c)      Bankruptcy Court Approval; Bankruptcy Sale Order. (i) The Bankruptcy Sale Order shall have been entered by the Bankruptcy Court and shall not be subject to a stay and the Bankruptcy Court shall have provided such other relief as may be necessary or appropriate to allow the consummation of the transactions contemplated by this Agreement, and (ii) the Bankruptcy Sale Order shall have become a Final Order, unless this condition in this clause (ii) has been waived in writing by Purchaser in its sole and absolute discretion. The Bankruptcy Sale Order shall exempt Seller and Purchaser from compliance with the terms of any bulk sales or similar Laws in any applicable jurisdiction in respect of the transactions contemplated by this Agreement.

(d)      No Violation of Orders. No preliminary or permanent injunction or other order of any court or Governmental Authority or Law that prevents the consummation of the transactions contemplated hereby shall be in effect.

(e)      Alaska Airlines Agreements.  Purchaser shall have negotiated and entered into forms of Code Share Agreement, Mileage Plan Program Participation Agreement, and Capacity Purchase Agreement with Alaska Airlines, Inc., all of which shall be acceptable in form and substance to Purchaser in its sole and absolute discretion.

(f)      Assumption, Sale and Assignment of Contracts.  Subject to **Section 2.5(c)**, the Bankruptcy Court shall have authorized in the Bankruptcy Sale Order the assumption and assignment of the Assumed Contracts to Purchaser on terms satisfactory to Purchaser.

(g)      [Reserved].

(h)      Permits. Purchaser shall have obtained Permits in replacement of any Permits that are not transferable by Seller to Purchaser and that are necessary for Purchaser to take title to all of the Acquired Assets at Closing and thereafter to operate all aspects of the Business including specifically approval by the DOT of the 49 U.S.C. §41105 transfer to Purchaser of Seller's Certificate of Public Convenience and Necessity.

(i)      FAA Certificate. The Air Carrier Certification Process under Title 14 of the Code of Federal Regulations (14 CFR) for Part 135 and for Part 121 air carriers (including all routes that Purchaser has stated that it wishes to continue servicing) and such Certificate re-issuance procedures as FAA might determine shall have been accomplished with the FAA such

that Purchaser shall be entitled to commence providing air transportation for passengers and freight pursuant to such re-issued FAA Part 121 and Part 135 Certificate.

(j)     Certain Agreements. Any consents required to the assignment or transfer of the Assigned Contracts, including without limitation the Engine Services Agreements to be acquired from Seller, shall have been obtained to the reasonable satisfaction of Purchaser. In addition, Purchaser shall have, with respect to any asset of Seller that may be secured by a purchase money security interest, security interest or lien that is senior to any security interest or lien of Purchaser, entered into a lease with Seller, in the Purchaser's sole and absolute discretion, whereby Purchaser leases certain assets rather than purchasing such assets as an Acquired Asset hereunder.

(k)     Material Adverse Effect. There shall not have been any event or events causing a Material Adverse Effect.

(l)     Violations of Law. There shall be no violations of Law that, in the opinion of Purchaser in its sole and absolute discretion, could adversely affect in any manner Purchaser's operation of the Business.

(m)     Schedules and Exhibits. All of the Schedules and Exhibits shall have been delivered prior to execution of this agreement and shall all be acceptable to Purchaser in its reasonable discretion.

(n)     Deliverables. Sellers shall have delivered or be prepared to deliver all of the items required by **Section 10.2** and all other items required to be delivered by Seller as of the Closing Date pursuant to the terms and conditions of this Agreement.

For avoidance of doubt, there shall be no conditions precedent to Purchaser's obligation to consummate the transactions contemplated by this Agreement, except for those conditions precedent specifically set forth in this **Section 9.2**. Upon the non-fulfillment of any condition set forth in this **Section 9.2**, this Agreement may, at Purchaser's option, be terminated pursuant to, in accordance with and with the effect set forth in ARTICLE 11.

## ARTICLE 10
## CLOSING AND DELIVERIES

Section 10.1   Closing.     The consummation and effectuation of the transactions contemplated hereby pursuant to the terms and conditions of this Agreement (the "**Closing**") shall be held on the first Business Day on which all conditions (except for only those conditions that by their terms can only be satisfied on the Closing Date) to the obligations of the parties hereto set forth in **ARTICLE 9** to consummate the transactions contemplated hereby are first satisfied and/or waived, or at such other time, date and place as the parties shall mutually agree (the "**Closing Date**"). The Closing shall on the Closing Date occur at 10:00 a.m., Pacific Time, in the offices of Keller & Benvenutti LLP in San Francisco, California, or as otherwise agreed by the Parties.  All proceedings to be taken and all documents to be executed and delivered by all parties at the Closing shall be deemed to have been taken and executed simultaneously and no proceedings shall be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered. Upon consummation of the Closing, the purchase and sale of the Acquired Assets

29

and the assumption of the Assumed Liabilities hereunder shall be deemed to have occurred as of 12:01 a.m. (Alaska Time) on the Closing Date.

Section 10.2    Seller's Deliveries.  At the Closing:

(a)    the sale, transfer, assignment, conveyance and delivery by Seller of the Acquired Assets to Purchaser or any entities as Purchaser shall direct, shall be effected by the execution  and delivery by Seller of (i) the Bills of Sale, (ii) the Assignment and Assumption Agreement, (iii) the Trademark Assignment Agreements and (iv) such special or limited warranty deeds, additional bills of sale, endorsements, assignments and other instruments of transfer and conveyance reasonably satisfactory in form and substance to Purchaser;

(i)    Seller shall deliver all keys to Leased Real Property that are included in the Acquired Assets, combinations to any safes thereon and passwords for all computers thereon and any security devices therein;

(ii)    Seller shall deliver an officer's certificate, duly executed by a senior officer of Seller, certifying the matters set forth in **Section 9.2(a)** and **Section 9.2(b)**, in form and substance satisfactory to Purchaser;

(iii)    Seller shall deliver a non-foreign affidavit dated as of the Closing Date in form and substance required under Treasury Regulations issued pursuant to Section 1445 of the Code so that Purchaser is exempt from withholding any portion of the Purchase Price;

(iv)    Seller shall deliver possession of the Acquired Assets; and

(v)    Seller shall deliver duly and properly authorized and executed documents (in form and substance satisfactory to Purchaser) as to the amendment of Seller's organizational documents (the "**Organizational Amendments**") changing Seller's name to another name which does not include any of the following words "**Peninsula**", "**Peninsula Airways**", "**PenAir**" or other iteration thereof.

Section 10.3    Purchaser's Deliveries.  At the Closing:

(a)    Purchaser shall pay the Purchase Price less the Deposit; and

(b)    Purchaser shall execute and deliver to Seller the Assignment and Assumption Agreement and any other Ancillary Agreement which Purchaser is required to execute under the terms of this Agreement.

## ARTICLE 11
## TERMINATION

Section 11.1    Termination.  This Agreement may be terminated only in accordance with this **Section 11.1**. This Agreement may be, or, as applicable, shall be, terminated at any time before the Closing as follows:

(a)        by mutual written consent of Seller and Purchaser;

(b)        automatically and without any action or notice by Seller to Purchaser, or Purchaser to Seller, immediately:

(i)        upon the issuance of a final and non-appealable order, decree, or ruling or any other action by a Governmental Authority to restrain, enjoin or otherwise prohibit the transfer of the Acquired Assets contemplated hereby; or

(ii)        if Purchaser is not declared the winning bidder upon completion of the Auction.

(c)        by Purchaser:

(i)        [Reserved];

(ii)        if the Auction has not concluded on or prior to October 3, 2018;

(iii)        if the Bankruptcy Court has not entered the Bankruptcy Sale Order on or prior to October 5, 2018 (the "**Sale Order Deadline**");

(iv)        if there has been a misstatement, violation or breach by Seller of any representation, warranty, agreement or covenant contained in this Agreement (disregarding any supplement or amendment to any of the Schedules pursuant to **Section 6.3(a)**) which (x) has rendered the satisfaction of any condition to the obligations of Purchaser set forth in **Section 9.2** impossible or is not curable or, if curable, has not been cured within seven (7) days following receipt by Seller of written notice of such violation or breach from Purchaser, and (y) has not been waived by Purchaser;

(v)        at any time after November 15, 2018, if the Closing shall not have occurred;

(vi)        if, prior to the Closing, the Bankruptcy Case shall be converted into a case under chapter 7 of the Bankruptcy Code or dismissed;

(vii)        if there shall be excluded from the Acquired Assets any Assumed Contract that is not assignable or transferable pursuant to the Bankruptcy Code or otherwise without the consent of any Person other than Seller, to the extent that such consent shall not have been given prior to the Closing and the exclusion of such Assumed Contract shall, in the opinion of Purchaser in its sole and reasonable discretion, prevent Purchaser from effectively operating the Business;

(viii)        if Purchaser so elects in writing pursuant to **Section 6.5**;

(ix)        if any Claim is brought by any Person against any of Purchaser, any Purchaser Related Person or any of their affiliated or related Persons prior to the expiration of the applicable period in which such Claim could be brought;

31

(x)      if the Acquired Assets, in the opinion of Purchaser in its reasonable discretion, are not sufficient to enable Purchaser to effectively operate the Business;

(xi)     if there exists any default, violation or breach of or under any Contract to which Seller is a party which has not been disclosed to Purchaser;

(xii)    there exist any violations of Law (when either taken individually or in the aggregate) that either (x) were not disclosed by Seller to Purchaser by the Effective Date or (y) occurred after the Effective Date, and in the opinion of Purchaser in its reasonable discretion, could adversely affect in any manner Purchaser's operation of the Business;

(xiii)   the Exhibits delivered by Seller to Purchaser under this Agreement are not all acceptable to Purchaser in its reasonable discretion;

(xiv)    upon the approval by the Bankruptcy Court of an Alternate Transaction; or

(xv)     upon acceptance by Seller of an Alternate Transaction.

(d)      by Seller, if there has been a misstatement, violation or breach by Purchaser of any representation, warranty, agreement or covenant contained in this Agreement which (x) has rendered the satisfaction of any condition to the obligations of Seller set forth in **Section 9.1** impossible or is not curable or, if curable, has not been cured within seven (7) days following receipt by Purchaser of written notice of such violation or breach from Seller, and (y) has not been waived by Seller.

Each condition set forth in this **Section 11.1** pursuant to which this Agreement may be terminated shall be considered separate and distinct from each other such condition. If more than one of the termination conditions set forth in **Section 11.1** are applicable, Purchaser shall have the right to choose the termination condition pursuant to which this Agreement is to be terminated.

Section 11.2    Effect of Termination.

(a)      In the event of termination pursuant to **Section 11.1**, this Agreement shall become null and void and have no effect and no party hereto shall have any liability to the other parties hereto, except (i) if the circumstances giving rise to such termination were caused either by the other party's breach of this Agreement or by any of the representations and warranties contained in this Agreement by such other party being incorrect when made (disregarding any supplement or amendment to any of the Schedules pursuant to **Section 6.3(a)**) and (ii) with respect to the provisions of **ARTICLE 11**, **ARTICLE 12** and the applicable definitions set forth in **Schedule 1** hereto which shall expressly survive termination hereof.

(b)      If this Agreement is terminated for any reason, then the Seller and Purchaser shall promptly direct the Escrow Agent to disburse the Deposit to Purchaser, free and clear of any claims thereon by the Seller; provided, however, if this Agreement is validly terminated by Seller pursuant to **Section 11.1(d)**, then Seller shall be entitled to terminate this Agreement and Seller and Purchaser shall promptly direct the Escrow Agent to disburse the Deposit to Seller as

32

liquidated damages. SELLER AGREES THAT SELLER'S RIGHT TO THE PAYMENT OF THE DEPOSIT (TOGETHER WITH ALL INTEREST THEREON) AS PROVIDED IN THIS **SECTION 11.2(b)** SHALL BE SELLER'S SOLE AND EXCLUSIVE REMEDY AGAINST PURCHASER OR ANY OF ITS AFFILIATES OR ANY OF THEIR RESPECTIVE STOCKHOLDERS, PARTNERS, MEMBERS, OR REPRESENTATIVES FOR ANY AND ALL ADVERSE CONSEQUENCES THAT MAY BE SUFFERED BY SELLER BASED ON, RESULTING FROM, OR ARISING OUT OF OR RELATED TO THE TRANSACTIONS OR THIS AGREEMENT, INCLUDING ANY AND ALL DAMAGES, LOSSES, EXPENSES, AND FEES THAT MAY BE SUFFERED BASED ON, RESULTING FROM, OR ARISING OUT OF OR RELATED TO THE CIRCUMSTANCES GIVING RISE TO TERMINATION OF THIS AGREEMENT, AND UPON PAYMENT OF THE DEPOSIT TO SELLER IN ACCORDANCE WITH THIS **SECTION 11.2(b)**, NONE OF PURCHASER OR ANY OF ITS AFFILIATES OR ANY OF THEIR RESPECTIVE STOCKHOLDERS, PARTNERS, MEMBERS OR REPRESENTATIVES SHALL HAVE ANY FURTHER LIABILITY OR OBLIGATION RELATING TO OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS.

## ARTICLE 12
## MISCELLANEOUS

Section 12.1   Survival.  No representations or warranties of Seller or Purchaser made in this Agreement shall survive the Closing Date except as otherwise expressly provided in this Agreement. All covenants and agreements of Seller and Purchaser contained herein shall survive the Closing in accordance with their terms.

Section 12.2   Further Assurances.  At the request and the sole expense of the requesting party, Purchaser or Seller, as applicable, shall execute and deliver, or cause to be executed and delivered, such documents as Purchaser or Seller, as applicable, or their respective counsel may reasonably request to effectuate the purposes of this Agreement and the Ancillary Agreements.

Section 12.3   Successors and Assigns.  This Agreement and the various rights and obligations arising hereunder shall inure to the benefit of and shall be binding upon the parties hereto and their respective successors and permitted assigns, including any trustee appointed in any subsequent chapter 7 case of Seller and Seller, if the Bankruptcy Case is dismissed. Except as set forth in clauses (a) or (b) below, neither this Agreement nor any of the rights, interests or obligations hereunder may be transferred or assigned (including by operation of law in connection with a merger or sale of stock, or sale of substantially all the assets, of a Person) by any of the parties hereto without the prior written consent of the other party or parties hereto (which consent may be granted, withheld, conditioned or delayed in such other party's sole and absolute discretion), and any attempted assignment in contravention or breach of the foregoing shall be void and of no force or effect. Notwithstanding the foregoing:

(a)   Without the consent of Seller or any other Person, Purchaser may (i) assign this Agreement or any of Purchaser's rights, interests and/or obligations, in whole or in part (including the right or obligation to acquire any of the Acquired Assets or the right or obligation to assume any Assumed Liabilities), under this Agreement to one or more Persons who are Affiliates of Purchaser and (ii) designate any Person who is an Affiliate of Purchaser to perform

33

any of Purchaser's obligations, in whole or in part (including the obligation to acquire any of the Acquired Assets or the obligation to assume any Assumed Liabilities), under this Agreement.

(b)   Without the consent of Seller or any other Person, Purchaser may assign this Agreement or any of Purchaser's rights, interests and/or benefits, in whole or in part, under this Agreement as collateral to any lender of Purchaser.

Section 12.4   <u>Governing Law; Jurisdiction</u>.   This Agreement shall be construed, performed and enforced in accordance with, and governed by, the Laws of the State of Alaska (without giving effect to the principles of conflicts of laws thereof), except to the extent that the Laws of such State are superseded by the Bankruptcy Code or other applicable federal Law. For so long as Seller is subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent as to the foregoing to the exclusive jurisdiction of, the Bankruptcy Court. After Seller is no longer subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, any state or federal court having competent jurisdiction in Alaska.

Section 12.5   <u>Expenses</u>.   Except as otherwise provided in this Agreement, each of the parties hereto shall pay its own expenses in connection with this Agreement and the transactions contemplated hereby, including any legal and accounting fees and commissions or finder's fees, whether or not the transactions contemplated hereby are consummated.

Section 12.6   <u>Severability</u>.   In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and effect only if, after excluding the portion deemed to be unenforceable and the application of any provision so substituted, the remaining terms shall provide for the consummation of the transactions contemplated hereby in substantially the same manner as originally set forth at the later of (a) the Effective Date and (b) the date (if any) this Agreement was last amended.

Section 12.7   <u>Notices</u>.

(a)   All notices, requests, demands, consents, waivers and other communications required or permitted to be given under the terms of this Agreement must be in writing and will be deemed to have been delivered: (i) upon receipt, if delivered personally; (ii) on the day of transmission, if sent via electronic transmission to the email address below (provided confirmation of transmission is mechanically or electronically generated and kept on file by the sending party); and (iii) if sent by overnight courier service, one (1) Business Day after deposit with an overnight courier service with next day delivery specified, in each case, properly addressed to the party to receive the same. The addresses and facsimile numbers for such communications shall be:

If to Seller:

McHale, P.A.
1601 Jackson Street, Suite 200
Fort Myers, FL  33901
Attention:  Jerry McHale
Email: jerrym@thereceiver.net

With a copy to:

Johnson Pope Bokor Ruppel & Burns, LLP
SunTrust Financial Centre
401 East Jackson Street, Suite 3100
Tampa, FL 33602
Attention: Michael Markham
Email: MikeM@jpfirm.com

If to Purchaser:

Peninsula Aviation Services, Inc.
c/o Ravn Air Group
4700 Old International Airport Rd.
Anchorage, AK 99502
Attn:  Steve Jackson
Email:  Steve.Jackson@Flyravn.com

With a copy to:

Peninsula Aviation Services, Inc.
c/o Ravn Air Group
110 East 59th Street, 27th Floor
New York, NY  10022
Attn:  David L. Ratner, Esq.
Email:  dlr@jflpartners.com

With an additional copy to:
Keller & Benvenutti LLP
650 California Street, Suite 1900
San Francisco, California  94108
Attn:  Tobias S. Keller & Jane Kim
Email:  admin@kellerbenvenutti.com

      (b)     Any party hereto may change its address or facsimile number for the purpose of this **Section 12.7** by giving the other parties written notice of its new address in the manner set forth above. Written confirmation of receipt (A) given by the recipient of such notice, request, demand, consent, waiver or other communication, (B) mechanically or electronically

generated by the sender's email service containing the time, date and recipient or (C) provided by an overnight courier service shall be rebuttable evidence of personal service, receipt by facsimile or receipt from an overnight courier service in accordance with clause (i), (ii) or (iii) above, respectively.

Section 12.8    Amendments; Waivers.  This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by Purchaser and Seller, or in the case of a waiver, by the party hereto waiving compliance. A modification or amendment by a party shall only be effective if (a) it is in writing and signed by both the parties, (b) it specifically refers to this Agreement and (c) it specifically states that the party, as the case may be, is modifying or amending its rights hereunder and any waiver by a party shall only be effective if (i) it is in writing and signed by the waiving party, (ii) it specifically refers to this Agreement and (iii) it specifically states that the party is waiving its rights hereunder. Any waiver by any party hereto of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be or construed as a furthering or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement. Any amendment or modification shall be effective only in the specific instance and for the specific purpose for which it was given.  Notwithstanding the foregoing, it is understood and agreed that any changes affected pursuant to **Section 2.6** shall not require compliance with this **Section 12.8**.

Section 12.9    Entire Agreement.  This Agreement, the other Ancillary Agreements and the schedules and exhibits attached hereto and thereto and the instruments referenced herein and therein (all of which are hereby incorporated herein by reference), supersede all other prior oral or written agreements among the parties hereto solely with respect to the matters contained herein and therein, and this Agreement, the other Ancillary Agreements and the schedules and exhibits attached hereto and thereto and the instruments referenced herein and therein, contain the entire understanding of the parties hereto solely with respect to the matters contained herein and therein. For clarification purposes, the Recitals are part of this Agreement. It is understood and agreed by the parties hereto that all rights, obligations and provisions set forth herein, as well as the exercise of any such rights, the performance of any such obligations and any action taken (or inaction) related to this Agreement by any party hereto, shall be completely separate from, and independent of, all of the foregoing related to, or arising under the DIP Credit Agreement.

Section 12.10    Seller Disclosures.  After notice to and consultation with Purchaser, Seller shall be entitled to disclose, if required by applicable Law or by order of the Bankruptcy Court, this Agreement and all information provided by Purchaser in connection herewith to the Bankruptcy Court, the United States Trustee, parties in interest in the Bankruptcy Case and other Persons bidding on assets of Seller. Other than statements made in the Bankruptcy Court (or in pleadings filed therein), Seller shall not issue (prior to, on or after the Closing) any press release or make any public statement or public communication without the prior written consent of Purchaser, which shall not unreasonably be withheld or delayed; provided, however, Seller, without the prior consent of Purchaser, may issue such press release or make such public statement as may, upon the advice of counsel, be required by Law or any Governmental Authority with competent jurisdiction.

36

Section 12.11 <u>Headings</u>.  The article and section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

Section 12.12 <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to each other party. In the event that any signature is delivered by facsimile transmission or by an e-mail which contains a portable document format (.pdf) file of an executed signature page, such signature page shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such signature page were an original thereof

Section 12.13 <u>Name Change</u>.  Immediately following the Closing, Seller shall discontinue the use of its current name (and any other trade names currently utilized by Seller) and shall not subsequently change its name to or otherwise use or employ any name which includes the words "**Peninsula**," "**Peninsula Airlines**," "**PenAir**" or any iteration thereof, and Seller shall cause its name in the caption of the Bankruptcy Case to be changed to the new names as provided for by the Organizational Amendments required to be delivered under **Section 10.2(a)(v)**. From and after the Closing, Seller covenants and agrees not to use or otherwise employ any of the trade names, corporate names, "d/b/a" names or similar Intellectual Property rights utilized by Seller in the conduct of the Business, which rights shall be included in the Acquired Assets purchased hereunder. Seller hereby irrevocably authorizes Purchaser to file, immediately following the Closing, the Organizational Amendments with the Alaska Secretary of State and in each State in which Seller is qualified to do business.

Section 12.14 <u>Payments and Revenues</u>.  If after the Closing, Seller shall receive any payment, revenue or other amount that belongs to Purchaser pursuant to this Agreement, Seller shall promptly remit or cause to be remitted the same to Purchaser.

Section 12.15 <u>Waiver of Jury Trial</u>**.**  EACH PARTY HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON, RELATING TO OR ARISING OUT OF THIS AGREEMENT. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALLENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, ANTITRUST CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMONLAW OR STATUTORY CLAIMS. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS. EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS  REVIEWED THIS WAIVER WITH LEGAL COUNSEL OF ITS OWN CHOOSING, OR HAS HAD AN OPPORTUNITY TO DO SO, AND THAT IT KNOWINGLY AND  VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS, HAVING HAD THE OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS, OR MODIFICATIONS TO THIS AGREEMENT. IN THE

EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT WITHOUT A JURY.

Section 12.16  <u>No Third Party Beneficiaries</u>.  This Agreement is intended for the benefit of the parties hereto and their respective permitted successors and assigns, and is not for the benefit of, nor may any provision hereof be enforced by, any other Person, other than Purchaser's Related Persons.

*[Signature page follows]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

**PURCHASER:**

PENINSULA AVIATION SERVICES, INC.

By: _____

Name:

Title:

**SELLER:**

PENINSULA AIRWAYS, INC.

By: _____

Name:

Title:

## Schedule 1

## DEFINED TERMS

"**Accounts Receivable**" means accounts receivable, negotiable instruments, chattel paper (including, without limitation, completed work that has not yet been billed), credit card and other receivables (including, without limitation, in respect of services rendered including air transportation or other services performed by Seller but unbilled or uncollected as of Closing) for goods shipped, products sold, licenses granted or otherwise associated with the Business.

"**Acquired Assets**" has the meaning ascribed to in it in **Section 2.1** of this Agreement.

"**Affiliate**" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning ascribed to it in the preamble of this Agreement.

"**Aircraft Leases**" means those aircraft leases between Seller and each of Jetstream Aviation Capital, LLC, Montrose Global LLP, Turbo Lease LLC and GSST LLC, in each case including all loose equipment provided by the lessor thereunder and all maintenance and other records required to be maintained thereunder.

"**Alaska Airlines Contracts**" means any Capacity Purchase Agreements, Code Share Agreements, Mileage Plan Program Participation Agreements, and the Passenger Services Agreement for (BOS) (including all amendments and modifications thereto) between Alaska Airlines, Inc. and its affiliates and Seller.

"**Allocation Statement**" has the meaning ascribed to it in **Section 3.2** of this Agreement.

"**Alternate Transaction**" means a transaction or series of related transactions pursuant to which Seller (a) accepts a Qualified Bid, other than that of Purchaser, as the highest or best offer, or (b) sells, transfers, leases or otherwise disposes of, directly or indirectly, including through an asset sale, stock sale, merger, reorganization or other similar transaction (by Seller or otherwise), including pursuant to a stand-alone plan of reorganization or refinancing, all or substantially all of the Acquired Assets (or agrees to do any of the foregoing) in a transaction or series of transactions to a party or parties other than Purchaser.

"**Ancillary Agreement**" means any other agreement, document or instrument that Seller or Purchaser, as applicable, enters into in connection with the consummation of the transactions contemplated hereby.

"**Assigned Causes of Action**" means any rights, claims and Causes of Action (i) against Critical Vendors, and (ii) arising out of or related to the Acquired Assets against any Person,

including claims and Causes of Action related to Contracts, Facilities Leases, Leases and other agreements related to the Acquired Assets.

"**Assigned Contract**" has the meaning ascribed to it in **Section 2.5(b)(ii)** of this Agreement.

"**Assignment and Assumption Agreement**" means the Assignment and Assumption Agreement in substantially the form annexed hereto as **Exhibit B** evidencing the assignment to and assumption by Purchaser of all rights and obligations under the Assigned Contracts.

"**Assumed Contract**" has the meaning ascribed to it in **Section 2.5(a)(ii)** of this Agreement and shall include in all cases the Code Share Agreements.

"**Assumed Employee Liabilities**" has the meaning ascribed to it in **Section 2.3(b)** of this Agreement.

"**Assumed Environmental Liabilities**" has the meaning ascribed to it in **Section 2.3(c)** of this Agreement.

"**Assumed Liabilities**" has the meaning ascribed to it in **Section 2.3** of this Agreement.

"**Auction**" means the auction for the sale of Seller's assets conducted by Seller pursuant to the Bidding Procedures Order.

"**Bankruptcy Cases**" has the meaning ascribed to it in the recitals of this Agreement.

"**Bankruptcy Code**" has the meaning ascribed to it in the recitals of this Agreement.

"**Bankruptcy Court**" has the meaning ascribed to it in the recitals of this Agreement.

"**Bankruptcy Sale Order**" means an order, in all material respects in the form of **Exhibit A**, issued by the Bankruptcy Court, which Bankruptcy Sale Order shall be acceptable to Purchaser in its sole and absolute discretion.

"**Bidding Procedures Order**" means the order relating to bidding procedures entered by the Bankruptcy Court on August 31, 2018 (ECF No. 472).

"**Bill of Sale**" means each Bill of Sale in all material respects in the form of **Exhibit C** conveying to Purchaser title to all of the Acquired Assets.

"**Business**" has the meaning ascribed to in the recitals to this Agreement.

"**Business Day**" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in New York, Delaware or Alaska are authorized by Law or other governmental action to close.

"**Capacity Purchase Agreements**" means those certain Contracts consisting of capacity purchase agreements, however entitled, with Alaska Airlines, Inc.

"**Cash**" means all cash on hand and in banks, cash equivalents, marketable securities, short-term investments, treasury bills, money orders, checks (including cash in transit such as checks received prior to the Closing, whether or not deposited or cleared prior to the Closing), checking account balances, instruments for the payment of money, certificates of deposit and other time deposits.

"**Casualty**" has the meaning ascribed to it in **Section 6.5** of this Agreement.

"**Causes of Action**" means all claims for relief and causes of action relating to a Claim held by Seller immediately prior to the Closing Date, including, but not limited to, any and all obligations, rights, suits, damages, causes of action, causes of action arising under Chapter 5 of the Bankruptcy Code.

"**Claim**" has the meaning ascribed by Bankruptcy Code §101(5), including all rights, claims, causes of action, defenses, debts, demands, damages, offset rights, setoff rights, recoupment rights, obligations, and liabilities of any kind or nature under contract, at law or in equity, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto.

"**Closing**" has the meaning ascribed to it in **Section 10.1** of this Agreement.

"**Closing Date**" has the meaning ascribed to it in **Section 10.1** of this Agreement.

"**COBRA**" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

"**Code**" means the Internal Revenue Code of 1986, as amended, and the regulations issued thereunder.

"**Code Share Agreements**" means those certain Contracts consisting of code share agreements, however entitled, all marketing arrangements with other airlines (which operate a flight and for which Seller sells tickets), and all pro-rate agreements and interline partner agreements.

"**Contract**" means any agreement, contract, lease, sublease, purchase order, arrangement, license, commitment, insurance policy or other binding arrangement or understanding (including, without limitation, Code Share Agreements, Capacity Purchase Agreements, Service Agreements, and leases for the Leased Property), whether written or oral, and any amendments, modifications or supplements thereto that is an executory contract pursuant to Section 365 of the Bankruptcy Code.

"**Contracts Schedule**" has the meaning ascribed to it in **Section 2.5(a)(i)** of this Agreement.

"**Critical Vendors**" means those lessors, vendors, suppliers, service providers, contractors, and employees that (i) will provide material support to the Purchaser post-Closing; and (ii) have been identified by Purchaser in a writing delivered to the Seller prior to the Closing Date (which writing may be revised or amended at any time prior to the Closing Date).

3

"**Cure Amounts**" means all amounts, costs and expenses required by the Bankruptcy Court to cure all defaults under the Contracts so that they may be sold and assigned to Purchaser pursuant to Sections 363 and 365 of the Bankruptcy Code.

"**Data**" means all Documents and data related to the Business, including, but not limited to all clinical, analytical, bench and manufacturing data.

"**Deposit**" has the meaning ascribed to it in **Section 3.1(a)** of this Agreement.

"**Designation Period**" means the period after the entry of the Bankruptcy Sale Order and a date to be mutually agreed between Purchaser and Seller, provided that such date shall be no earlier than ten (10) calendar days before the Closing Date and no later than the Closing Date.

"**DIP Credit Agreement**" means that certain Secured Super-Priority Debtor-In-Possession Credit Agreement, dated November 14, 2017, by and between Seller and Debello Investors LLC, as amended, restated, supplemented or otherwise modified and in effect from time to time.

"**DIP Orders**" means the interim and final orders of the Bankruptcy Court approving Seller's entry into the DIP Credit Agreement.

"**Documents**" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer and supplier lists and information, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), cost of pricing information, business plans, quality control records and procedures, blueprints, accounting, legal and tax files (including all related memoranda and analyses therein), all files, customer and supplier files and documents (including credit information), personnel files and employment records relating to employees (including, without limitation, applicable completed I-9 forms), supplier lists, records, literature and correspondence, including materials relating to Inventories, services, marketing, advertising, promotional materials, and other similar materials to the extent related to, used in, held for use in, the Business or the Acquired Assets in each case whether or not in electronic form, whether or not physically located on any of the premises of the Leased Property, but excluding any materials exclusively related to any Excluded Assets.

"**DOT**" has the meaning ascribed to it in **Section 2.1(d)**.

"**Effective Date**" has the meaning ascribed to it in the preamble of this Agreement.

"**Employee Benefit Plans**" means all (a) employee pension benefit plans as defined in Section 3(2) of ERISA, (b) employee welfare benefit plans as defined in Section 3(1) of ERISA, and (c) stock option, bonus, deferred compensation, retention, severance, or termination pay plans or policies or any other plans or policies providing for compensation or benefits (including any employment, severance, change in control or similar agreement or any arrangement relating to a sale of the Business), in each case, that is maintained, administered, or contributed to (or with respect to which any obligation to contribute has been undertaken) by Seller or any ERISA

4

Affiliate and that covers any current or former employee, director, manager, member, officer or consultant of Seller (or their dependents, spouses or beneficiaries).

"**Employees**" means all individuals employed by Seller in connection with the Business.

"**Encumbrances**" means, to the extent not considered a Lien, any security interest, lien, collateral assignment, right of setoff, debt, obligation, liability, pledge, levy, charge, escrow, encumbrance, option, right of first refusal, restriction (whether on transfer, disposition or otherwise), third party right, right limited to Seller personally, other agreement term tending to limit any right or privilege of Seller under any Contract, conditional sale Contract, title retention Contract, mortgage, lease, deed of trust, hypothecation, indenture, security agreement, easement, license, servitude, proxy, voting trust, transfer restriction under any shareholder or similar agreement, or any other agreement, arrangement, Contract, commitment, understanding or obligation of any kind whatsoever, whether written or oral, or imposed by any Law, equity or otherwise.

"**Engine Services Agreements**" means all service agreements set forth on **Schedule 2.5(a)** hereto.

"**Environmental Laws**" means all federal, state, and local statutes, regulations, and ordinances (including common laws) concerning employee health and safety, the pollution or protection of human health or the environment, including, without limitation, the Clean Air Act, the Clean Water Act, the Resource Conservation Recovery Act, the Comprehensive Environmental Response, Compensation and Liability Act, the Occupational Safety and Health Act, and the Hazardous Materials Transportation Act.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) which is treated as a single employer with Seller under Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA.

"**Escrow Agent**" means the Trustee or his designee.

"**Essential Air Services**" means the program administered by the DOT to ensure that small communities previously served by certificated air carriers before deregulation would continue to receive scheduled passenger service, with subsidies if necessary

"**Excluded Assets**" has the meaning ascribed to it in **Section 2.2** of this Agreement.

"**Excluded Liabilities**" has the meaning ascribed to it in **Section 2.4** of this Agreement.

"**FAA**" shall mean the United States Federal Aviation Administration or any successor thereto.

"**Facilities Leases**" means all airport base facility leases to which Seller, or either of them, are a party, all of which are included in **Schedule 2.5(a)** hereto, which shall include without limitation all of Seller's right and interest thereunder in and to Seller's pilot and maintenance bases

5

and hangar leases in Anchorage, Alaska, and Boston, Massachusetts, ramp space, and associated service facilities.

"**Federal Aviation Act**" shall mean the Federal Aviation Act of 1958, as amended, together with the aviation regulations of the FAA, as the same may be in effect from time to time.

"**Final Order**" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, (i) which has not been reversed, stayed, modified, amended, enjoined, set aside, annulled or suspended, (ii) with respect to which no request for a stay, motion or application for reconsideration or rehearing, notice of appeal or petition for certiorari is filed within the deadline provided by applicable statute or regulation or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought, and (iii) as to which the deadlines for filing such request, motion, petition, application, appeal or notice referred to in clause (ii) above have expired.

"**FF&E**" means all equipment including, without limitation, laser equipment, machinery, fixtures, furniture and other tangible property including all attachments, appliances, fittings, gas and oil burners, lighting fixtures, signs, doors, cabinets, partitions, mantels, motors, pumps, screens, plumbing, heating, air conditioning, refrigerators, freezers, refrigerating and cooling systems, waste disposal and storing, wiring, telephones, televisions, monitors, security systems, racks, ovens, stoves, carpets, floor coverings, wall coverings, office equipment, kitchen appliances, computers (including point-of-sale terminals and systems), registers and safes, trash containers, meters and scales, combinations, codes and keys, and any other furniture, fixtures, equipment and improvements.

"**FNBA Deposit**" means cash on deposit with First National Bank of Alaska in an amount necessary to cover all potential obligations to First National Bank of Alaska related to future flights to be operated by the Purchaser as of the Closing Date.  Any cash remaining on deposit with First National Bank of Alaska, after satisfaction of the foregoing shall constitute Cash and be returned to the Seller.

"**Governmental Authority**" means any federal, state, local court, tribunal, governmental department, agency, board or commission, regulatory or supervisory authority, or other administrative, governmental or quasi-governmental body, subdivision or instrumentality.

"**Ground Equipment Leases**" has the meaning ascribed it in **Section 4.19(c)**.

"**Ground Support Equipment**" means each vehicle, tool, piece of equipment, or other tangible asset owned or leased by Seller in connection with aircraft operations or maintenance at facilities included in or covered by the Station Leases.

"**Hazardous Material**" means (i) those substances included within the statutory and/or regulatory definitions of "hazardous substance," "hazardous waste," "extremely hazardous substance," "regulated substance," "contaminant," "hazardous materials" or "toxic substances," under any Environmental Law, (ii) those substances listed in 49 C.F.R. 172.101 and in 40 C.F.R. Part 302; (iii) any material, waste or substance which is (A) petroleum, oil or a fraction or constituent thereof, (B) ACM, (C) polychlorinated biphenyls, (D) formaldehyde, (E) designated

6

as a "hazardous substance" pursuant to 33 U.S.C. § 1321 or listed pursuant to 33 U.S.C. § 1317; (F) explosives or (G) radioactive materials (including naturally occurring radioactive materials); (iv) solid wastes that pose imminent and substantial endangerment to health or the environment; (v) any material, waste or substance designated, classified or regulated as a "hazardous material," "hazardous substance," "toxic substance," "pollutant," or "pollution" under any Environmental Laws; (vi) radon gas in an ambient air concentration exceeding four picocuries per liter (4 pCi/l); (vii) such other substances, materials, or wastes that are or become classified or regulated under Environmental Laws; (viii) any Underground Storage Tank and (ix) any Aboveground Storage Tank.

"**Held Contract**" has the meaning ascribed to it in **Section 2.5(a)(ii)** of this Agreement.

"**Improvements**" means buildings, structures, systems, facilities, easements, rights-of-way, privileges, improvements, licenses, hereditaments, appurtenances and all other rights and benefits belonging, or in any way related, to the Leased Property.

"**Intellectual Property**" means all intellectual property, including, without limitation, (a) patents, patent applications and patent disclosures, together with all reissuances, continuations, continuations in part, revisions, extensions, reexaminations, provisionals, divisions, renewals, revivals, and foreign counterparts thereof and all registrations and renewals in connection therewith, (b) trademarks, service marks, trade dress, logos, trade names (including but not limited to Peninsula Airways and PenAir) and corporate names and other indicia of origin and corporate branding, together with all translations, adaptations, derivations and combinations thereof and including all goodwill associated therewith, and all applications, registrations and renewals in connection therewith, (c) works of authorship, copyrightable works, copyrights and all applications, registrations and renewals in connection therewith, (d) mask works and all applications, registrations and renewals in connection therewith, (e) trade secrets, inventions and confidential business information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, business and marketing plans and proposals, assembly, test, installation, service and inspection instructions and procedures, technical, operating and service and maintenance manuals and data, hardware reference manuals and engineering, programming, service and maintenance notes and logs), (f) Software, (g) internet addresses, uniform resource locaters, domain names, websites and web pages, (h) any and all other intellectual property and proprietary rights, (i) company-wide telephone numbers (including facsimile numbers) and (j) goodwill related to all of the foregoing, in each case to the extent  used or useful in the operation of the Business or related to the Acquired Assets.

"**Interest**" means "interest" as that term is used in Section 363(f) of the Bankruptcy Code.

"**Inventories**" or "**Inventory**" means all inventory of any kind or nature (other than FF&E) whether or not prepaid, and wherever located, held or owned, including, without limitation, office and medical supplies, service parts and accessories.

"**Knowledge**," with respect to Seller, means the actual or constructive knowledge of any of the following individuals:  Danny Seybert, Scott Bloomquist and David M. Richards.

"**Law**" means any law, statute, ordinance, regulation, rule, code or rule of common law or otherwise of, or any order (including, without limitation, the Orders), judgment, injunction or decree issued, promulgated, enforced or entered by, any Governmental Authority.

"**Leased Property**" means all real or personal property leased, subleased or licensed by Seller which is used or useful in connection with the operation of the Business or related to the Acquired Assets, including Station Leases and Ground Equipment Leases.

"**Lien**" has the meaning given to that term in the Bankruptcy Code.

"**Material Adverse Effect**" means a state of facts, event, change, effect, condition or matter that, individually or in the aggregate is or could reasonably be expected to result in a material adverse change or material adverse effect on (i) the condition (financial or otherwise), business, properties, assets, results of operations, or prospects of the Business, (ii) the ability of Seller to conduct the Business consistent with recent history, including (but not limited to) operating all routes that Seller serves as of the Closing with a sufficient number of pilots, dispatchers, and mechanics, all in Purchaser's reasonable discretion, or (iii) the ability of Seller to perform its obligations under this Agreement and the Ancillary Agreements in material compliance with the requirements thereof or to consummate the transactions contemplated hereby and thereby; provided, however, that to the extent any such material adverse effect results from any of the following matters, such effect shall be disregarded and shall not be taken into account in determining whether a material adverse effect has occurred under this definition: (A) changes in financial, credit or securities markets generally, including any changes in prevailing interest rates, in each case, which do not disproportionately affect Seller relative to other industry participants, (B) changes in general economic or political conditions in the United States or regionally, in each case, which do not disproportionately affect Seller relative to other industry participants, (C) the announcement, pendency or consummation of the sale of the Acquired Assets, (D) the consequences of filing the Bankruptcy Case and the impact thereof on the condition (financial or otherwise), business, properties, assets, or results of operations of the Business, (E) actions taken or omissions made after the date of this Agreement with the express written consent of Purchaser, (F) changes resulting from general industry-wide conditions that do not disproportionately affect Seller relative to other industry participants, and (G) changes in applicable Law or accounting rules, including generally accepted accounting principles.

"**Nonassignable Asset**" has the meaning ascribed to it in **Section 2.5(c)** of this Agreement.

"**Orders**" means the Bankruptcy Sale Order and the Bidding Procedures Order.

"**Ordinary Course of Business**" means the conduct by Seller of the Business in substantially the same manner as conducted as of the Effective Date and in compliance with applicable Law, Permits and Contracts in all material respects, after taking into consideration changes that are a result of, relating to, in connection with or resulting from the Bankruptcy Case.

"**Organizational Amendments**" has the meaning ascribed to it in **Section 10.2(a)(v)** of this Agreement.

"**Owned Station Items**" has the meaning ascribed to it in **Section 4.19(d)** of this Agreement.

"**Permitted Exceptions**" has the meaning ascribed to it in **Section 4.4** of this Agreement.

"**Permitted Liens**" means: (a) statutory liens arising in the Ordinary Course of Business that are not overdue and that do not affect in any material respect the value or use of the affected asset; (b) pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation; and (c) easements, rights-of-way, restrictions and other similar encumbrances other than monetary encumbrances, judgments and monetary liens that in each case do not detract in any material respect from the value or use of the property subject thereto or interfere in any material respect with the ordinary conduct of the business of Seller at the property subject thereto.

"**Permits**" means all licenses, certificates, permits, concessions, authorizations, grants, easements, variances, exemptions, consents, orders, franchise, filings, approvals, authorizations and licenses used, useable or useful in the operation of the Business or the use or enjoyment or benefit of the Acquired Assets.

"**Person**" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization or Governmental Authority or other entity.

"**Petition Date**" means August 6, 2017.

"**Purchase Price**" has the meaning ascribed to it in **Section 3.2** of this Agreement.

"**Purchaser**" has the meaning ascribed to it in the preamble of this Agreement.

"**Qualified Bid**" means competing bids qualified for the Auction in accordance with the Bidding Procedures Order.

"**Rejected Contract**" has the meaning ascribed to it in **Section 2.5(a)(ii)** of this Agreement.

"**Related Person**" means, with respect to any Person, all past, present and future directors, officers, members, managers, partners, limited partners, stockholders, employees, controlling persons, Affiliates, agents, professionals, attorneys, accountants, lenders, investment bankers or representatives of any such Person.

"**Retained Employees**" has the meaning ascribed to it in **Section 6.4(a)** of this Agreement.

"**Sale Hearing**" means the hearing to consider the entry of the Bankruptcy Sale Order.

"**Sale Order Deadline**" has the meaning ascribed to it in **Section 11.1(c)(iii)** of this Agreement.

"**Schedules**" has the meaning ascribed to it in **Section 6.3** of this Agreement.

"**Service Agreements**" has the meaning ascribed to it in **Section 4.19(i)** of this Agreement.

"**Software**" means any computer program, operating system, application, system, firmware or software of any nature, point-of-entry system, peripherals, and data whether operational, active, under development or design, nonoperational or inactive, including all object code, source code, comment code, algorithms, processes, formulae, interfaces, navigational devices, menu structures or arrangements, icons, operational instructions, scripts, commands, syntax, screen designs, reports, designs, concepts, visual expressions, technical manuals, tests scripts, user manuals and other documentation therefor, whether in machine-readable form, virtual machine-readable form, programming language, modeling language or any other language or symbols, and whether stored, encoded, recorded or written on disk, tape, film, memory device, paper or other media of any nature, and all databases necessary or appropriate in connection with the operation or use of any such computer program, operating  system, application, system, firmware or software.

"**Station**" shall mean any airport at which Seller has a Station Lease.

"**Station Lease**" shall have the meaning ascribed to such term in **Section 2.1(c)** of this Agreement.

"**Station Property**" shall mean all facilities, equipment, furnishings, fixtures (including permanent improvements to any property comprising Station Property), leasehold improvements, appurtenances and personalty (including, without limitation, ticket counters, ticket kiosks and other ticketing dispensers or devices) owned by Seller and used in connection with any Station Lease, but does not include Ground Support Equipment.

"**Tax**" or "**Taxes**" means all taxes, fees and other governmental charges, however denominated, including any interest, penalties or additions to such taxes, fees or charges that may become payable in respect thereof, imposed by any Governmental Authority, whether payable by reason of Contract, assumption, transferee liability, operation of law or Treasury Regulation Section 1.1502-6(a) (or any predecessor or successor thereof or any analogous or similar provision under Law), which taxes shall include all income taxes, payroll and employee withholding, unemployment insurance, social security (or similar), sales and use, excise, franchise, gross receipts, occupation, real and personal property, stamp, transfer, workers' compensation, customs duties, registration, documentary, value-added, alternative or add-on minimum, estimated, environmental (including taxes under Section 59A of the Code), passenger ticket and airport taxes, departure, arrival and flight segment taxes, jet fuel taxes, cargo taxes, passenger facility charges, customs user fees, immigration user fees, aircraft and passenger fees, agricultural inspection fees, transportation security fees, and other assessments or obligations of the same or a similar nature, whether arising before, on or after the Closing Date.

"**Tax Return**" means any report, return, information return, filing or other information, including any schedules, exhibits or attachments thereto, and any amendments to any of the foregoing required to be filed or maintained in connection with the calculation, determination, assessment or collection of any Taxes (including estimated Taxes).

"**Trademark Assignment Agreement**" means the Trademark Assignment Agreement in substantially the form annexed hereto as **Exhibit D** evidencing the assignment to Purchaser of all trademarks which are Acquired Assets.

10

"**Transaction Taxes**" has the meaning ascribed to it in **Section 7.1(a)** of this Agreement.

"**Treasury Regulation**" means, with respect to any referenced provision, such provision of the regulations promulgated by the United States Department of the Treasury.

"**Trust Fund Tax**" means any Tax for which Seller is liable to any Governmental Authority by reason of collecting it from passengers or another Person and holding the Tax until paid to the particular Governmental Entity to which it is owed, including fuel taxes, sales taxes, passenger ticket, departure and arrival taxes, excise taxes, and certain payroll taxes.

"**WARN Act**" means the Worker Adjustment and Retraining Notification Act, 29 U.S.C. Section 2101, *et seq*, as amended.